UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

CAROL CHESEMORE, DANIEL DONKLE,
THOMAS GIECK, MARTIN ROBBINS, and
NANNETTE STOFLET, on behalf of
themselves, Individually, and on behalf of all
others similarly situated,

          Plaintiffs,

          v.                                Civil Action No. 09-CV-000413

ALLIANCE HOLDINGS, INC., A.H.I., INC.,
DAVID B. FENKELL, PAMELA KLUTE,          Judge Conley
JAMES MASTRANGELO, STEPHEN W.          Magistrate Judge Crocker
PAGELOW, JEFFREY A. SEEFELDT,
ALPHA INVESTMENT CONSULTING
GROUP, LLC, and JOHN MICHAEL
MAIER,

          Defendants.

          And

TRACHTE BUILDING SYSTEMS, INC.
EMPLOYEE STOCK OWNERSHIP PLAN
and ALLIANCE HOLDINGS, INC.
EMPLOYEE STOCK OWNERSHIP PLAN
AND TRUST,

          Nominal Defendants.

**DEFENDANTS ALPHA INVESTMENT CONSULTING
GROUP, LLC'S, AND JOHN MICHAEL MAIER'S
RESPONSE TO PLAINTIFFS' MEMORANDUM ON REMEDIES & RELIEF**

Defendants, Alpha Investment Consulting Group, LLC ("Alpha") and John Michael

Maier (collectively hereinafter referred to as the "Alpha Defendants"), by and through their

attorneys, respectfully submit their response brief to the Plaintiffs' Memorandum on Remedies &

Relief ("Plaintiffs' Memorandum") and request that this Honorable Court reject certain

arguments submitted by the Plaintiffs and determine any remedies or relief (if any) for the Plaintiffs in the manner as set forth below by the Alpha Defendants.

## I.     INTRODUCTION

Plaintiffs alleged in their Second Amended Complaint ("Complaint") violations under the Employee Retirement Income Security Act of 1974 as amended ("ERISA") against various defendants in their capacities as fiduciaries of the Trachte Building Systems, Inc. ESOP ("Trachte ESOP") or the Alliance Holdings ESOP ("Alliance ESOP") or as non-fiduciaries with respect to the 2007 Transaction in which the Trachte ESOP was "spun-off" from the Alliance ESOP ("2007 Transaction").  Plaintiffs' Memorandum outlines the relief the Plaintiffs claim is appropriate given the alleged violations in the Complaint.  At this time, the Court has not yet issued its opinion as to which Defendants have any liability to Plaintiffs in this case, or the basis for any such liability.  To the extent allowed by the Court, the Alpha Defendants reserve the ability to supplement their arguments in this submission based on the Court's ruling.  Pursuant to the Court's prior orders, the Alpha Defendants submit this response to the Plaintiffs' Memorandum.[1]

## II.     ARGUMENT

### A.     The Plaintiffs fail to meet their burden showing that the Alpha Defendants caused the losses allegedly incurred by the Plaintiffs.

A causal connection is required between the breach of fiduciary duty and any losses incurred by a plan. See *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982); see also *Rogers v. Baxter Int'l, Inc.*, 710 F. Supp. 2d 722, 739 (N.D. IL 2010).  The use of the phrase "resulting from" in Section 409(a) of ERISA makes a fiduciary liable only for losses caused by a breach.

---

[1] To the extent such submissions are not inconsistent with the arguments set forth herein, the Alpha Defendants may adopt in whole or in part the responses of the Trustee and Alliance Defendants that are scheduled to be filed March 15, 2012, in response to Plaintiffs' damages submissions.

Id. See also 29 U.S.C. § 1109(a). The Seventh Circuit imposes the burden to prove causation on the plaintiffs. See *Leigh v. Engle*, 727 F.2d 113, 137 (7th Cir. 1984); see also *Whitfield v. Lindemann*, 853 F.2d 1298, 1304-05 (5th Cir. 1988) (recognizing that in the Seventh Circuit, the plaintiffs have a duty to prove casual connection). The Plaintiffs' citation to *Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992), for the argument that the Defendants must prove causation is inapplicable in the Seventh Circuit where it has already been clearly established that the Plaintiffs must meet this burden.

Plaintiffs' failure to address and prove causation completely undermines their argument for relief in this case. Additionally, totally ignoring the impact of the historic 2008 recession on Trachte's operations and stock value, as well as the self-storage industry as a whole, serves only to highlight Plaintiffs' inability to link the actions taken by the Alpha Defendants to the losses sustained by the Trachte ESOP, when after the beginning of the 2008 recession, Trachte's stock value declined precipitously. Trachte had experienced significant revenue growth in the years leading up to the 2007 Transaction and continued growth was expected in the future, so to blame the 2007 Transaction while ignoring the national economic and housing market collapses that took hold more than a year after the 2007 Transaction is illogical and renders Plaintiffs' conclusions heavily flawed, if not entirely baseless.

**B.**     **Plaintiffs' measurement of losses for breaches of fiduciary duty ignore the fact that fair market value was paid at the time of the 2007 Transaction.**

At the Phase I trial, the Court heard testimony from a number of experts, including Roseanne Aumiller, the author of the Barnes Wendling Fairness Opinion, that the $38.3 million purchase price for the 2007 Transaction represented the fair market value for the Trachte stock purchased by the Trachte ESOP at the time of the 2007 Transaction. John Murphy, President of Atlantic Management Company, provided expert testimony on behalf of the Alpha Defendants in

3

support of the fact that $38.3 million was not more than fair market value.  Indeed, Mr. Murphy explained that based on his expert opinion, the entire fair market value range utilized by Barnes Wendling, $26.2 million to $40.1 million (rounded), was lower than the $42.2 million fair market value assigned to the 2007 Transaction by Mr. Murphy.[2]  This difference was due in part to Mr. Murphy's determination that the Stout Risius Ross valuation reports, relied upon by Barnes Wendling, utilized conservative figures (i.e., the inclusion of a control premium, utilization of lower additional risk premiums due to company size, etc.) to determine its value for Trachte's stock.  Mr. Murphy further noted that the inclusion or exclusion of an ESOP tax shield or a discount for a lack of marketability in valuations is a gray area in the valuation community, without any clear consensus.  Given the unique nature of the "spin-off" 2007 Transaction, it is virtually certain that, at a minimum, reasonable minds would differ as to the application of either an ESOP tax shield or a discount for a lack of marketability in such a transaction.

Plaintiffs rely on Kevin Kreitzman's theories, which were soundly refuted at trial, to determine a valuation range at the date of the 2007 Transaction of $16.2 million and $18 million. Mr. Kreitzman has no practical experience whatsoever in preparing valuations and Plaintiffs failed to present any credible testimony to support their valuation conclusions.  In fact, Mr. Kreitzman's valuation was so far below the other expert reports that the reliability and validity of Mr. Kreitzman's overall conclusions must be called into question.  Indeed, the testimony of Mr. Murphy and Mr. Robert Gross, the Trachte ESOP Trustees' expert, thoroughly disparaged the methods (or lack thereof) employed by Mr. Kreitzman for determining Trachte's value.  Based

---

[2] Mr. Murphy concluded that the Indicated Value of Equity, Controlling-Interest (rounded) was $42,200,000. (Alpha Ex. 1176)  This conclusion did not factor in the $1.9 million tax shield and did not include a discount for lack of marketability.  While experts have testified that a discount for lack of marketability can range from 0% to 10%, Mr. Murphy did not believe it to be appropriate to reduce the value for the 2007 Transaction. *Id.* If his value was reduced by a 5% discount (i.e., $2.1 million) for lack of marketability, Mr. Murphy's $42.2

on Mr. Murphy's and Mr. Gross' testimony and valuation determinations, as well as the information provided by Rosanne Aumiller from Barnes Wendling and Jeffrey Beuttner from Stout Rissius Ross, both seasoned valuation professionals, it is clear that $38.3 million represented fair market value for the 2007 Transaction on August 29, 2007.

**C.**     **Response to Plaintiffs' measurement of losses for breaches of fiduciary duty**

Plaintiffs have espoused four methods for measuring the alleged losses sustained. As set forth below, most of these methods are simply inappropriate and/or unfounded based on the nature of the alleged losses sustained and without the support of credible expert opinions or testimony. Additionally, to the extent the Plaintiffs rely on information set forth in their expert Kevin Kreitzman's Phase 2 Report that is either new or was not previously disclosed, such arguments should be rejected by the Court. Reasons for striking specific information from Mr. Kreitzman's Phase 2 Report are set forth in the Defendants' Motion to Strike Portions of Kevin Kreitzman's Phase 2 Report. (Doc. No. 642.)

As set forth in their loss measurements, the Plaintiffs also continually assume that damages must equal at least $25 million in order to pay off the Trachte ESOP loan which has a current balance of $25 million. (Plaintiffs' Memorandum pp. 20 and 22.) This logic at first blush may appear attractive but there is no legal requirement that forces the Plaintiffs to pay off the Trachte ESOP with any damages awarded. In fact, Trachte continued to make payments to Chase Bank on this loan. As a homeowner is under no compulsion to use an award of damages toward the mortgage of his home if he successfully sues a seller for fraudulent misrepresentation, a leveraged ESOP is under no compulsion to payoff the underlying loan. In fact, level annual or monthly payments are often required under federal guidelines and the Internal Revenue Service

---

million fair market value would still exceed the 2007 Transaction purchase price by $1.8 million ($42.2 - $2.1 - $38.3).

will observe closely the operation of ESOPs that release encumbered securities in varying annual amounts. See 29 C.F.R. § 2550.408b-3(h)(3). As such, to state that any award must be at least $25 million because the Trachte ESOP loan must be paid off misrepresents the obligations of both Trachte and the Trachte ESOP under the law and the ESOP loan agreement. See ESOP Loan and Pledge Agreement § 2.3.

Finally, the Plaintiffs' silence in their loss measurements as to the existence or impact of the 2008 recession on Trachte is deafening. To ignore the uncontroverted decline in Trachte sales in excess of 50% which was attributable almost exclusively to the nationwide financial crisis, is to use ERISA as a means to escape the impact of the 2008 economic and housing market collapse which affected the entire nation. "ERISA was simply not intended to be a shield from the sometimes volatile financial markets." *Griffin v. Flagstar Bancorp, Inc.*, 2011 U.S. Dist. LEXIS 35080, *41 (E.D. Mich. 2011); see also *In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 853 (S.D. Ohio 2009).

> *1.     While the Alpha Defendants dispute they (or any Defendants) caused any loss to the Plaintiffs, the difference between the price paid and fair market value is the only appropriate measure of loss in this case, should one be found to exist.*

In cases where there is a proven overpayment of stock, the difference between the price paid and fair market value at the time of the transaction is the measure of loss used by courts. Where the alleged "breach involved nothing more than paying too high a price for the stock," liability should be measured at "the difference between the price paid and the price that should have been paid." *Neil v. Zell*, 767 F. Supp. 2d 93, 944-945 (N.D. Ill. 2011), *citing Valley Nat. Bank*, 837 F.Supp. at 1289. See also *Reich v. Mason Tenders District Council of Greater New York*, 909 F.Supp. 891 (S.D. N.Y. 1995). "This measure of loss is appropriate where the loss is due to self-dealing or price manipulation" or an overpayment, which is what essentially the

Plaintiffs claim against various defendants in this case. See *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 603 (8th Cir. 1995) (fair market value "snapshot" approach appropriate for cases involving overpayments which was not the case in *Roth*). (Plaintiffs' Complaint ¶¶ 202, 203 and 246.)

Losses incurred as a result of a breach of ERISA § 406 should be measured as the difference between what the ESOP paid for the stock and its fair market value at the time of the transaction, plus interest. See *Horn v. McQueen*, 215 F.Supp.2d 867, 881 (W.D. Ky. 2002)(case involved measuring damages sustained by participants of a leveraged ESOP resulting from breaches of ERISA §§ 404 and 406 by employing the fair market value method). See also *Reich v. Hall Holding Co.*, 990 F. Supp. 955 (N.D. Ohio January 9, 1998), aff'd by *Chao v. Hall Holding Co.*, 285 F.3d 415, 420 (6th Cir.2002). Horn and Hall Holding both involved allegations against fiduciaries for failing to conduct a prudent investigation into the ESOP's investment and for causing the plan to pay more than adequate consideration. The allegations of this case are similar to Horn and Hall Holding and as such, any measurement of damages should also be similar. (Plaintiffs' Complaint ¶¶ 203, 237, 246, 247, 253, 257-259, 263, 280 and 289.)

Notwithstanding the above two paragraphs and for reasons set forth above, Plaintiffs are not entitled to monetary damages because the $38.3 million purchase price paid represented fair market value at the time of the 2007 Transaction. The entire range of values recommended by Barnes Wendling was actually lower than the $42.2 million fair market value purchase price determined by Mr. Murphy. (Alpha Ex. 1176.) Additional valuation professionals agreed that the Trachte ESOP paid fair market value for the Trachte stock as of August 29, 2007. The Barnes Wendling report provided a reasonable valuation range for the 2007 Transaction of $26.2 million to $40.1 million (rounded) with the final purchase price being $38.3 million (rounded).

(Joint Ex. 29.)  The final purchase price was approximately $1.8 million within the Barnes Wendling range of fair market value and $3.9 million less than the fair market value purchase price determined by Mr. Murphy.[3]  Based on the majority of credible expert testimony and utilizing the fair market value method, no loss occurred as a result of the purchase of the Trachte ESOP stock at the time of the 2007 Transaction.

> 2.     *The total payments made by the Trachte ESOP is an inappropriate measure of loss in this case.*

As set forth in *Valley National*, which also involved a violation of ERISA § 406, the court assessed damages for losses sustained by participants in a leveraged ESOP based on the total contributions made by the company to the ESOP following the transaction. *Valley National Bank*, 837 F. Supp. at 1289.  Similar to *Horn* and *Hall Holding*, the court in *Valley National* considered the measurement of the overpayment of the stock at the time of the transaction as the

---

[3] The two factors that appeared to concern the Court during the trial were the $1.9 million ESOP tax shield included in the Barnes Wendling's Fairness Opinion, and the absence of any discount for lack of marketability. Assuming *arguendo* that the Court concludes that there was liability in part because one or both of these factors should have been applied in a manner to lower the fair market value, this would result in the $38.3 million purchase price exceeding the range of values prepared by Barnes Wendling by an amount ranging between $100,000 and $2 million.

The range of values provided by Barnes Wendling included the $1.9 million ESOP tax shield. If the tax shield were removed completely from the determination of fair market value, the value range would be reduced to $24.3 million to $38.2 million (rounded) for the 2007 Transaction which results in the purchase price being $100,000 outside the Barnes Wendling range of values. Alternatively, if the Court determined to take into account some amount as a discount for lack of marketability (e.g., 5% of the purchase price totaling $1.9 million), the amount outside the Barnes Wendling range of values (but not the value conclusions rendered by Mr. Gross or Mr. Murphy which reflect the 2007 price was indeed for not more than fair market value) would also total $100,000 given that a 5% reduction in the Barnes Wendling calculations would simply lower the range to a high of $38.2 million. If the Court were to determine that the range of values should be adjusted for both the tax shield amount ($1.9 million) and a 5% discount for lack of marketability ($1.9 million) then the purchase price would fall outside the Barnes Wendling range of values by $2 million.

As previously discussed, the use of both of these methods has no consensus in the valuation community and therefore the use of such factors in any ESOP transaction would likely depend on a number of factors including the proclivity and past practice of the valuation expert employed to prepare the particular valuation. Also, the impact on the final purchase price for the 2007 Transaction of the possible elimination of the ESOP tax shield and/or the inclusion of a discount for lack of marketability should be considered in light of any impact that less conservative multiples utilized by SRR and Barnes Wendling in the market approach valuation method would have also had on the final purchase price. Regardless of the result reached by the Court as to

basis for its damages.  *Id.*  Using the total contributions as a measurement form of loss assumes that without the 2007 Transaction, Trachte and/or Alliance would have made equivalent contributions or payments of some type to or for the benefit of the Plaintiffs.  This is without any factual support in the record, and at best is speculative.  It is particularly inappropriate to apply such a method in this case and over the period of time since 2007, as it totally disregards the unique circumstances of this case – the devastating impact the 2008 recession had on the economy and Trachte.  One likely impact would be layoffs, pay freezes and benefit reductions.  Thus, any loss of damages should not be measured by this method.

> 3.    *The difference between the price paid and current market value is inappropriate as it provides a windfall to the Plaintiffs by ignoring the impact of the 2008 economic collapse.*

Plaintiffs advocate the calculation of their loss as the difference between the total amount paid for the stock acquired by the ESOP and its current fair market value.  Plaintiffs cite to *Mohler v. Unger*, 1994 U.S. Dist. LEXIS 21697 (S.D. Ohio 1994) in support of this proposal.  Plaintiffs' reliance on *Mohler*, however, is misplaced for the simple reason that the damages awarded in *Mohler* were based in part, on the amount paid for the stock *at the time of the transaction* not at the current fair market value.  *Id.* at *18, *53-54.

Plaintiffs also cite to *Neil* and *Roth* for the prospect that the current market method is the most straight forward and more appropriate method to use in the instant case than the fair market value method.  However, both cases recognize that the current market value is inappropriate in cases such as this where the Plaintiffs claim there has been either an overpayment, alleged self-dealing or alleged price manipulation.  See *Neil*, 767 F. Supp. at 944, and *Roth* 61 F.3d at 1289.  Furthermore, unlike the instant case, *Roth* did not involve an ERISA § 406 violation which

---

the amount of any loss, given the Alpha Defendants' limited role in this case, and its diligence under the circumstances, it would be inequitable to assess any significant portion of any loss against them.

involve prohibited transactions for self-dealing or failing to obtain adequate consideration. Plaintiffs fail to recognize this key distinguishing factor.

Simply stating that the price paid by the Trachte ESOP to acquire Trachte, minus Trachte's current market value, is straight-forward, completely ignores the numerous and unforeseen market fluctuations which occurred long after the 2007 Transaction — the beginning of the current economic recession in 2008. Furthermore, as noted above, Trachte experienced a 50-60% decrease in sales as a result of the market downturn which, of course, had nothing to do with the 2007 Transaction. Trachte's demonstrated ability to make payments on the ESOP loan through the third quarter of 2008 is additional evidence that the 2007 Transaction was clearly not the cause, and certainly, not the proximate cause, for the subsequent reduction of the value of Trachte stock. Put simply, use of the current market value method would cause an unjustified windfall to the Plaintiffs by ignoring the effects the prevalent market conditions had on all industries in this country, not just the self-storage industry, and would shield the Plaintiffs from the impact the 2008 economic recession unfortunately had on the entire nation. The aim of ERISA remedies is not to give [plaintiffs] a windfall. *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2nd Cir. 2000).

        4.    *The difference between what the plan earned and what a prudent investment would have earned is inappropriate in this case.*

This methodology is advanced and promoted by the Plaintiffs under the support of *Donovan v. Bierwirth,* 754 F.2d 1049 (2nd Cir. 1985). However, this method should be rejected for a number of reasons. First, like *Roth*, *Bierwirth* did not involve violations of ERISA § 406, as such, a "prudent investment" method is inappropriate. Second, utilizing hindsight to pick a "risk free" investment would guarantee that the Plaintiffs experienced steady gains during a time when virtually all classes and types of investments suffered significant losses thus resulting in an

inequitable windfall for the Plaintiffs.[4]  See *Benefits Committee of Saint-Gobain Corporation v. Key Trust Company of Ohio*, 313 F3d 919, 932 (6th Cir. 2002).[5]  Finally, *Bierwith* involved a measurement of lost opportunity cost when an inappropriate investment was made despite there being no actual loss sustained by the plan. See *Leigh v. Engle*, 619 F. Supp. 154, 160 (7th Cir. 1985). The instant case is clearly distinguishable where the allegations involve purported imprudent investments and conduct that led to *actual losses* sustained by the Trachte ESOP rather than to gains that should have been higher due to the alleged imprudent investments and conduct.  Given that Plaintiffs either paid fair market value, or at most there was a slight overpayment as addressed above, it would not be equitable to award Plaintiffs relief based on an alternative investment of either their account balances or the purchase price. Clearly, whether Plaintiffs should have paid a slightly lesser amount due to the ESOP tax shield or the discount for lack of marketability, they would be in the exact same position today.

> 5.   *Any damages assessed should be assessed equitably among the applicable Defendants.*

Assuming arguendo that the Court determines that Plaintiffs are entitled to relief, and that some amount of monetary damages should be assessed against the Alpha Defendants under ERISA § 409, such damages should be limited based on the Alpha Defendants' contractually limited and narrow involvement with the 2007 Transaction. There can be no question in this case that the role of the Alpha Defendants was to provide a "thumbs up/thumbs down" direction, and in doing so they were entitled to rely upon the various valuation information provided by or at the direction of Alliance, Trachte or the Trachte ESOP Trustees. (Jt. Ex. 25.)  According to the

---

[4] Of course, Plaintiffs "risk free" theory was never disclosed in expert discovery and for this reason alone should not be considered by the Court.

[5] It should be noted that if the Plaintiffs' accounts would have remained with Alliance, Alliance's ability to make any alternative investment would have been greatly impacted by the inevitable and severe decline of Trachte which would have consequently reduced the value of Alliance's holdings significantly.

Seventh Circuit in *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984), "ERISA grants the courts the power to shape an award so as to make the injured plan whole while at the same time apportioning the damages equitably between the wrongdoers." See also *Leimkuehler v. American United Life Ins. Co.*, 2011 LEXIS 44490 *6-7 (S.D. Ind. 2011). There is no contention, let alone evidence, that the Alpha Defendants acted with any illicit motive or ill will. Mr. Maier at all times acted diligently and devoted exhaustive efforts to assist in the 2007 Transaction. Plaintiffs' hindsight criticisms of the Alpha Defendants reflect, at best, that they relied on information that even among experts, there was no consensus of any wrongdoing.

> **D.    Plaintiffs' request for a permanent injunction against the Alpha Defendants from serving as an ERISA non-directed fiduciary is baseless and mean-spirited in nature.**

Plaintiffs recognize that all services provided to the Trachte ESOP by the Alpha Defendants ceased as of the closing of the 2007 Transaction. As such, any argument for removal of the Alpha Defendants as a Trachte ESOP fiduciary is clearly moot. Nevertheless, Plaintiffs vindictively attempt to irreparably harm the Alpha Defendants by seeking a permanent injunction against the Alpha Defendants that would forever bar Mr. Maier and Alpha from serving as a non-directed fiduciary "for any employee benefit plan and in any capacity for any plan covering any class member or any Trachte plan...."[6] (Plaintiffs' Memorandum pp. 24-25.) Plaintiffs cite to three cases in support of this punitive injunction, each of which involved egregious actions by fiduciaries such that any comparison of such fiduciaries to the Alpha Defendants and the services performed by them on behalf of the Trachte ESOP Participants is clearly inappropriate.

---

[6] It should be noted that the Complaint sought an injunction against the Alpha Defendants that was limited to a prohibition from serving as a fiduciary for "any plan that covers the employees of Trachte and/or any members of the Class or Subclass," not the far reaching punitive injunction they seek now. (Complaint ¶ 8 of the Prayer for Relief.)

Specifically, Plaintiffs cite to *Reich v. Lancaster*, 843 F. Supp. 194 (N.D. Texas 1993), aff'd, 55 F.3d 1034 (5th Cir. 1995), which involved a breach of fiduciary duty whereby the fiduciary, within two and one-half years of becoming the plan administrator, convinced the board of trustees of a health and welfare fund to spend nearly $1 million on life insurance premiums which earned the fiduciary and other related parties (which were family members) over $550,000 in commissions. The court in Reich found that the breaching fiduciary not only rendered advice with the sole intent of personal financial gain without regard to the plan participants, but also withheld information from the trustees that such fiduciary had a conflict with the company administering the life insurance claims (the fiduciary had a controlling interest in the company). Plaintiffs fail to cite to any action by the Alpha Defendants that even remotely can be equated to the violations committed by the fiduciaries in Reich, as even Plaintiffs must concede the complete dearth of any such evidence.   The Alpha Defendants, unlike Plaintiffs' assertions directed at the other Defendants, clearly had no conflict of interest in any way, nor have Plaintiffs made any suggestion of any such claim.

Additionally, Plaintiffs cite to *Chao v. Merino*, 452 F.3d 174 (2nd Cir. 2006), which involved the permanent injunction of a fiduciary who allowed a known embezzler to repeatedly embezzle hundreds of thousands of dollars from an ERISA plan and took no steps to prevent that theft. Id. at 179. Finally, Plaintiffs cite *Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992), where the court levied permanent injunctions against two accountants for self-dealing and showing a complete disregard for the application of ERISA's "prudent man" rule. Id. at 667-663.   Again, no evidence of self-dealing or complete inaction on the part of the Alpha Defendants exists in this case. To the contrary, ample evidence was presented at trial that the Alpha Defendants acted at all times in good faith and solely in the interests of the participants.

13

The following actions taken by the Alpha Defendants, even viewed outside the limitations of its engagement, clearly represent that they acted exclusively for the benefit of the Trachte ESOP participants and beneficiaries:

- The Alpha Defendants performed their services as if they were subject to ERISA § 404 as set forth in the Alpha Engagement Letter; (Jt. Ex. 25.)

- As set forth in Schedule A of the Alpha Engagement Letter, the Alpha Defendants were to conduct their review of the 2007 Transaction in order to determine whether such transaction was "in the best interests of the [Trachte ESOP] plan participants;" (Id.)

- At the conclusion of the Alpha Defendants' review, and based on Alpha's role as dictated by the Alpha Engagement Letter and the verbal direction from Ken Wanko, Brian Anderson and James Mastrangelo, Mr. Maier determined that the proposed 2007 Transaction was "in the best interest of the [Trachte] ESOP and the [Trachte] ESOP plan participants…;" (Jt. Ex. 28.)

- Mr. Maier advocated for the protection of the Trachte ESOP participants' interests by offering to raise issues relating to the terms of the 2007 Transaction by which Mr. Maier sought to improve in the interests of the Trachte ESOP participants;

- Mr. Maier independently verified the credibility and reputation of Stout Risius Ross ("SRR") and Barnes Wendling in order to determine, in part, the reliability of their respective reports and opinions; (Alpha Exs. 1170-71.)

- Mr. Maier carefully reviewed the impact that the 2007 Transaction would have on the Trachte ESOP participants and shareholders by interviewing numerous individuals and reviewing the numerous financial and other documents in order to project the financial impact of the 2007 Transaction; (Alpha Exs. 1112-13, 1137-38 and 1144-48.)

- Mr. Maier prudently compared the SRR valuation with the criteria set forth in the Proposed DOL Regulations; (Alpha Ex. 1147.)

- Mr. Maier prepared a working draft letter in anticipation of its preparation of issuing a "thumbs up" report for the 2007 Transaction which included detailed notes addressing, in part, the advantages and disadvantages of the 2007 Transaction to the Trachte ESOP participants; (Alpha Ex. 1140.) and

- After initially receiving only partial portions of the SRR valuation, and despite some resistance in obtaining complete information, Mr. Maier insisted on obtaining a complete valuation report advising that he would not approve the transaction for this reason alone, unless he was given the complete set of facts. To further protect the participants' interests, Mr. Maier made sure Barnes

Wendling received the comprehensive SRR valuation report before Barnes Wendling completed its final report. (Alpha Ex. 1143.)

Plaintiffs' bold assertions that the Alpha Defendants failed to "appreciate their own duties" and generally failed to "fulfill their duties" is without support in the record and in any case, the conduct of the Alpha Defendants hardly rose to the level of flagrant abuses of fiduciary duty normally required to justify a lifetime injunction. (Plaintiffs' Memorandum p. 24.) For example, a permanent injunction was found to be appropriate when plan fiduciaries breached their duties in a "massive way" when $20 million in plan losses occurred after a breach of fiduciary duty caused approximately $30 million of a plan's assets to be invested in companies in which one or more of the defendants owned an interest and/or from which one or more defendants received fees or other consideration. See *Beck v. Levering*, 947 F2d 639, 641 (2nd Cir. 1991). The alleged breaches of fiduciary duty pertaining to the Alpha Defendants do not involve self-dealing or bad faith which are typically required elements for a permanent injunction; indeed in each of the authorities relied upon by Plaintiffs, the breaching fiduciary engaged in misconduct the likes of which simply does not exist in this case with respect to the Alpha Defendants. See *Chao v. USA Mining Inc.*, 2007 WL 208530 *17-18 (E.D. Tenn. 2007).

Plaintiffs also attempt to support their argument for a permanent injunction against the Alpha Defendants by misrepresenting the record. Plaintiffs' make the statement in their memorandum that an injunction is merited because the Alpha Defendants made assertions during this case "that they had no fiduciary duties" despite the contrary language in the Alpha Engagement Letter. (Plaintiffs' Memorandum p. 24.) However, the use of this document as support for Plaintiffs' request for an injunction is inappropriate and misleading. The argument that the Alpha Defendants were not fiduciaries was a legal argument advanced by counsel for the Alpha Defendants during summary judgment proceedings. It is simply disingenuous for the

Plaintiffs to assert that Alpha or Mr. Maier ever made such an assertion.  The reasonable and logical legal argument as to the fiduciary status of the Alpha Defendants, given the amount of supporting evidence and after having benefited from full discovery and hindsight, is not a basis to conclude that the Alpha Defendants are unfit to ever act as a non-directed fiduciary for an employee benefit plan.  In fact, despite the actions (both known and unknown at the time) of others which impacted and formed the Alpha Defendants' role in the 2007 Transaction, the Alpha Defendants always believed during the scope of their involvement with the 2007 Transaction, that they were performing the services as fiduciaries of the Trachte ESOP.  The suggestion by the Plaintiffs to the contrary blatantly misrepresents the record.

Additionally, the Plaintiffs' flippant request to permanently enjoin the ability of the Alpha Defendants, and in particular Mr. Maier, to be a non-directed fiduciary of any employee benefit plan would cause irreparable harm to Mr. Maier and potentially destroy his career which is far beyond any harm he or Alpha allegedly inflicted upon the Plaintiffs.  If the Plaintiffs' request for an injunction is granted, Mr. Meier would have to resign immediately from any existing appointment involving non-directed fiduciary functions, effectively leaving Mr. Maier unemployable.  Permanent injunctions are "an appropriate remedy under ERISA § 409, where individuals are found to have participated in egregious self–dealing or other serious misconduct." *Chao v. Linder*, 2007 WL 1655254 *15 (N.D. Ill. 2007) (certain fiduciaries were guilty of racketeering and as a result were permanently barred from acting as a fiduciary).  Plaintiffs have cited cases involving both egregious self–dealing or other serious misconduct yet have failed to cite any specific or similar conduct by the Alpha Defendants that warrants a permanent, career-ending injunction.  Plaintiffs advance no credible authority that supports their request for such a harsh remedy.

Finally, Plaintiffs impermissibly reference the likely unavailability of insurance coverage for any judgment against the Alpha Defendants. (Plaintiffs' Memorandum fn. 12, p. 25.)   The apparent purpose of this maneuver is to enhance Plaintiffs' contention that the Alpha Defendants should suffer a lifetime bar from acting as a non-directed fiduciary for any benefit plan. Plaintiffs' submission violates both the letter and spirit of Fed.R.Evid. 411 and applicable law. A fundamental principle of federal law is that evidence and argument about a party's financial situation, indemnification, ability to pay and insurance are generally inadmissible.  *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998); *Munly v. Carlson*, 125 F.Supp.2d 1117, 1119 (N.D. Ill. 2000).   With respect to a party being insured against liability, Fed.R.Evid. 411 provides:

> "Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully.  But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control."

While the Alpha Defendants recognize this is a bench proceeding rather than a jury trial, neither the principle nor the federal rule barring such inadmissible evidence are limited by the nature of the decision maker.

In this case, Plaintiffs' reference to the lack of insurance coverage regarding the fiduciary claims against the Alpha Defendants was not submitted for the purpose of bias or prejudice, or any other exception noted in Fed.R.Evid. 411.[7]   Rather, Plaintiffs attempt to circumvent Fed.R.Evid. 411 for a purely punitive motive.   Where case law, including Plaintiffs' own authorities, does not support removing the Alpha Defendants, and in particular, Mr. Maier, from continuing to work in his chosen field, Plaintiffs resort to attempting to impermissibly sway the

---

[7] Plaintiffs did more than refer to the absence of coverage; they submitted the entire insurance policy as an exhibit! (Doc. No. 636.)

17

Court by referencing inadmissible matters.   In other words, because Plaintiffs believe they cannot obtain any meaningful equitable monetary relief from the Alpha Defendants, they seek instead a "pound of flesh."  Plaintiffs' request should be rejected from the outset.

**E.**      **Rescission of the 2007 Transaction and restoration of profits are inappropriate in the instant case.**

Plaintiffs seek to rescind the 2007 Transaction and cite to *Eaves v. Penn*, 426 F. Supp. 830, 836-37 (W.D. Okla. 1976), as authority for this equitable remedy.  *Eaves* is a rare ERISA case involving an ESOP where rescission was employed by the court and is distinguishable from the instant case in that no prohibited transaction under ERISA § 406 was alleged or held to have existed.  As discussed above, cases involving prohibited transaction allegations typically pertain to overpayments with losses measured based on the fair market value of the stock at the time of the applicable transaction rather than a rescission of the transaction. Additionally, rescission would be highly inappropriate because the 2007 Transaction spawned the Trachte ESOP and the Court is being asked to determine how and to what extent the 2007 Transaction should be rescinded.  As a practical matter, rescission is not an appropriate remedy to be applied to the Alpha Defendants.

Plaintiffs also raise the issue of restoring any profits any fiduciary made through the use of assets of the plan.  (Plaintiffs' Memorandum p.14.)  However, Plaintiffs fail to distinguish in the case of the Alpha Defendants, how a fee for a service (regardless of the ultimate recommendation) amounts to profit arising from the use of plan assets.  The Alpha Defendants made no profits from the use of the Trachte ESOP assets.  The Alpha Defendants were merely hired to perform a service for a flat, one-time fee (similar to RSM McGladrey) that was not contingent on the outcome of the 2007 Transaction.

**F.**   **Plaintiffs' request for prejudgment interest is misplaced and inappropriate.**

It is clear that in the Seventh Circuit, prejudgment interest may be appropriate in ERISA cases. See *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 819 (7th Cir. 2002). However, whether to award an ERISA plaintiff pre-judgment interest is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities. *Id.* at 820. Awards of prejudgment interest must not result in over-compensation of the plaintiff. *Wickham Contracting v. Local Union No. 3, IBEW*, 955 F.2d 831, 833-35 (2nd Cir. 1992), *cert. denied*, 113 S. Ct. 394 (1992). Among the factors considered in determining whether to award prejudgment interest is the presence of bad faith or unjust enrichment. See *Trustmark Life Ins. Co. v. Univ. of Chi. Hosps.*, 207 F. 3d 876, 885 (7th Cir. 2000); see also *Landwehr v. DuPree*, 72 F.3d 726, 739 (7th Cir. 1995). Because no allegations or evidence in the record supports a finding that the Alpha Defendants were unjustly enriched or acted in bad faith, an award of pre-judgment interest is inappropriate. Moreover, given that Plaintiffs' losses are attributable to the historical economic collapse rather than any action by the Alpha Defendants, this only solidifies that prejudgment interest would result in a windfall and is inappropriate in this case.

The standard prejudgment rate in ERISA cases is the prime rate and should be applied as of the date of judgment, assuming prejudgment interest is a proper consideration. *Fritcher*, 301 F.3d at 820; see also *Ruppert v. Alliant Energy Cash Balance*, 716 F. Supp. 2d 801, 830 (W.D. Wis. 2010); and *Berger v. Xerox Retirement Income Guaranty Plan*, 231 F. Supp. 2d 804 (S.D. Ill. 2002). Due to the consistent use of the prime rate in the Seventh Circuit, no interest rate higher than the prime rate,[8] if any, should be utilized in any award for pre-judgment interest.

---

[8] The relevant prime rate as reported by the Wall Street Journal is 3.25%.

### III.    CONCLUSION

Based on the foregoing, the Court should not award any losses to the Plaintiffs because the fair market value was paid by the Trachte ESOP for the 2007 Transaction and the Plaintiffs failed to prove that the 2007 Transaction caused any alleged losses.  Alternatively, the measure of any losses sustained by the Plaintiffs should be based on the difference between the amount paid and the fair market value at the time of the 2007 Transaction, and, at worst, not exceed an amount ranging between $100,000 and $2 million.  Regardless, any portion of any loss assessed against the Alpha Defendants should be minimal.  Further, Plaintiffs' request for an injunction against the Alpha Defendants should be denied because it is baseless and not supported by any legitimate authority.

Dated:  March 15, 2012

ALPHA    INVESTMENT    CONSULTING GROUP, LLC and JOHN MICHAEL MAIER

By:  ___/s/James J. Convery_____
       James J. Convery
       One of Their Attorneys

James J. Convery
Laner, Muchin, Dombrow, Becker,
  Levin and Tominberg, Ltd.
515 North State Street, Suite 2800
Chicago, Illinois 60654
(312) 467-9800
(312) 467-9479 (fax)
State Bar No. 06180697

## CERTIFICATE OF SERVICE

I, James J. Convery, an attorney, hereby certify that on March 15, 2012, I caused to be served a copy of the foregoing **Defendants Alpha Investment Consulting Group, LLC's and John Michael Maier's Response to Plaintiffs' Memorandum on Remedies and Relief**, in the above-captioned matter to be filed with the Clerk of the District Court and served on the parties of record, including those listed below, by operation of the Court's CM/ECF electronic filing system, addressed to:

Karen L. Handorf
Robert Joseph Barton
Monya M. Bunch
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC 20005-3934
khandorf@cohenmilstein.com
jbarton@cohenmilstein.com
mbunch@cohenmilstein.com

Marc I. Machiz
Cohen Milstein Sellers & Toll PLLC
255 South 17th Street, Suite 1307
Philadelphia, PA 19103
mmachiz@cohenmilstein.com

Marie A. Stanton
Andrew W. Erlandson
Hurley, Burish & Stanton, S.C.
33 East Main Street, Suite 400
Madison, WI 53703
mstanton@hbslawfirm.com
aerlandson@hbslawfirm.com

Alan I. Silver
Kevin P. Hickey
Jonathan P. Norrie
Bassford Remele
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402-3707
asilver@bassford.com
khickey@basssford.com
jnorrie@bassford.com

Patrick F. Koenen
Angela M. Rust
Lora L. Zimmer
Hinshaw & Culbertson LLP
100 West Lawrence Street
Appleton, WI 54911
pkoenen@hinshawlaw.com
arust@hinshawlaw.com
lzimmer@hinshawlaw.com

Patrick Williamson Spangler
Charles B. Wolf
Vedder Price
222 North LaSalle Street
Chicago, IL 60601
pspangler@vedderprice.com
cwolf@vedderprice.com

Lynn Marie Stathas
Reinhart Boerner Van Deuren S.C.
22 East Mifflin Street, Suite 600
Madison, WI 53703
lstathas@reinhartlaw.com

Kristen Marie Blankley
Christopher Craig Woods
Squire, Sanders & Dempsey L.L.P.
2000 Huntington Center
41 South High Street
Columbus, OH 43215
kblankley@ssd.com
cwoods@ssd.com

Ryan A. Sobel
Jeffrey J. Wedel
Squire, Sanders & Dempsey L.L.P.
4900 Key Tower
127 Public Square
Cleveland, OH 44114
rsobel@ssd.com
jwedel@ssd.com

Tara M. Mathison
Davis Kuelthau
Attorneys At Law
111 East Kilbourn Avenue, Suite 1400
Milwaukee, WI 53202-6613
tmathison@dkattorneys.com

/s/James J. Convery
James J. Convery