IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CAROL CHESEMORE, DANIEL DONKLE,
THOMAS GIECK, MARTIN ROBBINS, and
NANETTE STOFLET, on behalf of
themselves, Individually, and on behalf of all
others similarly situated,

       Plaintiff,

v.

ALLIANCE HOLDINGS, INC., AHI, INC.,
DAVID B. FENKELL, PAMELA KLUTE,
JAMES MASTRANGELO, STEPHEN W.
PAGELOW, and JEFFREY A. SEEFELDT,
ALPHA INVESTMENT CONSULTING
GROUP, LLC, and JOHN MICHAEL
MAIER,

       Defendants,

and

TRACHTE BUILDING SYSTEMS, INC.
EMPLOYEE STOCK OWNERSHIP PLAN
and ALLIANCE HOLDINGS, INC.
EMPLOYEE STOCK OWNERSHIP PLAN
AND TRUST,

       Nominal Defendants.

Civil Action No. 09-CV-000413

Judge Conley

## DEFENDANTS MASTRANGELO, KLUTE, AND SEEFELDT'S RESPONSE TO PLAINTIFFS' MEMORANDUM ON REMEDIES AND RELIEF

Defendants James Mastrangelo ("Mastrangelo"), Pamela Klute ("Klute"), and Jeffrey A. Seefeldt ("Seefeldt," collectively the "Trustees"), by and through their attorneys, submit the following response to the Plaintiffs' Memorandum on Remedies and Relief.[1]

---

[1] Plaintiffs' Memorandum on Remedies and Relief is Docket # 634 and is referred to herein as "Plaintiffs' Damages Brief" and cited as (Pls. Damages. Br., at p.___).

## I.   <u>INTRODUCTION</u>

Plaintiffs' have alleged that the Trustees, as fiduciaries, breached their obligations to the participants of the Trachte ESOP under Sections 404 and 406(a)(1)(A) and (D) of ERISA. 29 U.S.C. §§ 1104; 1106(a)(1)(A) and (D).   The Trustees deny that they have breached their fiduciary duties, as demonstrated during Phase I of this case, and specifically deny that the transaction price of $38.3 million was more than fair market value on the transaction date.   The Trustees submit this memorandum regarding potential remedies pursuant to the Court's Order[2] assuming, *arguendo*, that the Court finds that the Trustees breached their fiduciary duties in some fashion.

In their Damages Brief, Plaintiffs attempt to identify every possible theory of damages that could apply to an ERISA case, while ignoring the obvious: the economic recession caused the decline in value of Trachte stock, not the actions of the Trustees.   ERISA requires that Plaintiffs prove that any alleged loss to the Plan was *caused by the fiduciary breach*.   As discussed below, the decline in value of Trachte stock was caused by the national economic recession and the significant decline in demand for self-storage facilities starting in the fall of 2008, approximately one year after the 2007 transaction closed.   Plaintiffs have not shown that they would be in any better position now had any alleged breach not occurred.

This transaction closed on August 29, 2007.   Prior to that time, Trachte's revenues, EBITDA, and profits climbed steadily from 2002-2007 and this trend continued after the transaction until late 2008 when the national economy collapsed and credit markets froze.   As Steve Kindstrom from JP Morgan Chase testified, the impact on Trachte was "dramatic."   The ensuing economic recession that followed led to a 90% drop in the demand for self-storage

---

[2] Docket #631.

facilities compared to pre-recession levels.  As a result, Trachte's annual revenues are half of their pre-2007 levels and 2011 EBITDA was just over $100,000.

Even if it is assumed that the transaction price should have been negotiated downward by $3.8 million – i.e., an amount equal to the value of a 5% discount for lack of marketability and the ESOP tax shield – the Plan and its participants would be in exactly the same position today. Trachte's revenues still would have declined precipitously and the stock still would be valued at zero.  Accordingly, Plaintiffs' position on damages ignores the economic realities of this case and any award of damages would represent a windfall.

## II.    FACTS RELATED TO CAUSATION AND DAMAGES

### A.    Trachte's Pre-2007 Performance

The Trustees established at trial that the Alliance ESOP purchased 80% of Trachte and 60% of SNS in 2002 for approximately $24,000,000.  From 2002 until the 2007 transaction, Trachte was one of the portfolio companies held by Alliance Holdings, Inc., which was wholly owned by the Alliance ESOP.  From 2003-2007, Trachte's revenue and EBITDA grew significantly.  In 2003, Trachte's annual sales were approximately $58,099,111.  By 2006, Trachte's sales increased to $75,397,000, the highest sales figure in the company's history, and EBITDA reached $6.3 million (not including SNS).  In addition, Trachte continued to grow SNS, which resulted in an increase in SNS' real estate assets from $11.5 million in 2003 to $17.4 million by the end of 2006.  *See* (T1583-1586).

From 2002-2006, Alliance's stake in Trachte was valued by Stout Risius Ross ("SRR"). During this time period, the value of Trachte's common stock continued to rise as a result of increasing revenues, EBITDA, and the expansion of SNS.  As a result of upward valuations of Trachte stock, the Alliance ESOP accounts of the participant class increased as well.  By August

2007, Trachte made up over 50% of the Alliance ESOP portfolio and participant accounts were valued at $7.9 million at the time of the 2007 Transaction.

As of August 29, 2007, Trachte's EBITDA was ahead of budget for the year and over $500,000 higher than its August 2006 EBITDA. (T1538, at Alliance 00519). Operating Income and Net Income were both ahead of budget and 2006 levels. For purposes of the 2007 Transaction, SRR determined that the fair market value of Trachte stock was between $40.8 million and $47.3 million. An independent valuation firm, BWVS, performed a fairness opinion stating that the purchase price of $38.3 million represented fair market value and that the terms of the 2007 Transaction were fair. A professional fiduciary, Alpha, agreed that $38.3 million represented fair market value. And JP Morgan Chase agreed to loan $27.5 million to fund the transaction at this price.

### B.   Post-2007 Transaction Performance

At the close of 2007, Trachte recorded a record EBITDA of $7-8 million (without SNS), an increase in annual EBITDA performance of approximately 13%. (T1542, at Chase 004678). Trachte easily met its loan covenants and preferred interest rate payments on its first and second lien loans at the close of 2007. Customer demand, cashflow, and margins remained strong and this trend continued into 2008. *See* (T1542; T1545, at Chase 005452). As Mr. Kindstrom and Mr. Mastrangelo explained at trial, Trachte's business was generating significant cashflow and the Company made a $1.4 million pre-payment of its senior debt in mid-2008.

In September of 2008, Lehman Brothers filed for bankruptcy and the U.S. credit markets froze. This had a catastrophic short-term impact on Trachte, whose customer base is predominantly small real estate investors and entrepreneurs. As Mr. Kindstrom explained at trial, the impact of the collapse of credit markets on Trachte "was dramatic." Trachte's 2009 ESOP valuation states that "Trachte was faring well until October when sales ceased as the credit

markets froze and customers were unable to secure financing." (ESI 2409). Amidst the economic turmoil in late 2008, Trachte's sales team had revised their forecasts for 2009 to approximately $30 million, or less than half of Trachte's annual revenues in 2006 or 2007. In 2009, Trachte's sales dropped more than 50% to $33.4 million as new construction orders for Trachte's core product failed to materialize and customers were unwilling to commit to new projects in a recessionary economy. *Id*.

In the years that followed, the self-storage construction industry changed dramatically due to prolonged levels of extremely low customer demand, tight credit, and plunging real estate values. As noted in the 2010 Trachte ESOP valuation, "like the construction industry, the self storage market has dramatically changed…with over **3,000** units built in 2006, falling sharply to around **200** units built in 2010." (Trustees 42512). This represents a 93% drop in demand for Trachte's core product from pre-recession levels. In 2010, Trachte's sales still had not recovered but remained flat against 2009 levels at around $32.9 million.

In 2011, this trend continued with total revenue hovering around $33 million. Due to the fundamental shift in the credit markets and lack of demand for new self-storage buildings, Trachte's 2011 EBITDA was only $105,811, less than 3% of its EBITDA for any year from 2002-2007. (Trustees 42629). Trachte's EBITDA performance – which is a measure of its earning power before taking into account payments on any debt obligations – is a reflection of the dramatic shift in the self-storage construction industry. Trachte remains operational and has entered into forbearance agreements with JP Morgan Chase. Trachte's stock remains valued at zero.

CHICAGO/#2299603.5

III.   <u>ARGUMENT</u>

   A.   <u>Plaintiffs Cannot Prove That Any Action by the Trustees on or Before
        August 29, 2007 Caused the Loss Alleged</u>

   As explained below, Plaintiffs are not entitled to damages because they cannot show that

a breach of fiduciary duty caused a loss.  Because Section 409(a) of ERISA makes a fiduciary

liable only for losses "resulting from" a breach, a causal connection is required to award

damages or impose monetary liability.  29 U.S.C. § 1109(a); *see Brandt v. Grounds*, 687 F.2d

895, 898 (7th Cir. 1982) ("a causal connection is required between the breach of fiduciary duty

and the losses incurred by the plan").

   It is not enough for Plaintiffs to show a breach in 2007 and then point to a decline in the

value of their accounts.  ESOPs, which are excluded from ERISA's diversification requirements,

are subject to business fluctuations and economic factors which may significantly affect the

value of the company stock held by the Plan.  ERISA requires that a Plaintiff establish a causal

connection between the loss alleged and the fiduciary breach.  *Brandt*, 687 F.2d at 898; *Leigh v.

Engle*, 727 F.2d 113, 137 (7th Cir. 1984) (*Leigh I*).   The causation requirement contained in

Section 409(a) is consistent with the law of trusts.  As noted by the Fifth Circuit in *Whitfield v.

Lindemann*, 853 F.2d 1298, 1304 (5th Cir. 1988):

> "Section 212, comment e of the *Restatement (Second) of Trusts*,
> provides that a 'trustee is not liable for a loss resulting from the
> breach of trust if the same loss would have been incurred if he had
> committed no breach of trust.  Put another way, 'If the trustee
> commits a breach of trust and if a loss is incurred the trustee may
> not be chargeable with the amount of the loss if it would have
> occurred in the absence of a breach of trust.'  *Id* § 205, comment
> f.'"

   In the Seventh Circuit, the burden of proof on causation rests with the Plaintiffs.  *Id; see*

*also Leigh I*, 727 F.2d at 137 (the plaintiffs must prove a causal connection between the breach

of fiduciary duty and the plan losses); *see also Silverman v. Mutual Benefit Life Insurance Co.,*

138 F.3d 98, 104 (2nd Cir. 1998); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995) (plaintiff must show a causal link between the breach and harm suffered by plan); *Board of Trustees of AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 169776, at *7 (S.D.N.Y. Jan. 19, 2012) ("plaintiffs have the burden of proof on causation in ERISA actions").

On pages 8-9 of their Damages Brief, Plaintiffs imply that they do not have the burden to prove causation, citing two Eighth Circuit cases, *Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992) and *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994), for the proposition that the fiduciary must prove that the loss was not caused by the breach of fiduciary duty.  That is certainly not the law in the Seventh Circuit.  *See Whitfield v. Lindemann*, 853 F.2d 1298, 1304-05 (5th Cir. 1988) (recognizing a split in authority between the circuits highlighting that in the Seventh Circuit the plaintiffs have a duty to prove casual connection between the breach and the loss).

Plaintiffs interpretation of the Eighth Circuit cases may be incorrect in any event.  The *Martin* court expressly did not reach the causation issue and remanded to the district court on the issue of damages, *see Martin* 965 F.2d at 671 ("Without reaching the question of causation…."), and *Roth* simply found that there were issues of fact at the summary judgment stage.  *Roth*, 16 F.3d at 915.[3]  Causation is an element of the claim that the plaintiff has the burden of proving.  *See Silverman*, 138 F.3d at 105-6  & n. 1 (2nd Cir. 1998) (in concurrence); *Barry v. West*, 503 F.Supp.2d 313, 326 (D.D.C. 2007).

---

[3] Furthermore, the *Martin* decision is losing traction even within the Eighth Circuit, as the court in *Wright v. Medtronic, Inc.* held that *Martin* may have been abrogated by the Supreme Court.  2010 WL 1027808 (D.Minn. 2010) (the idea that an ERISA plaintiff need not prove loss causation possibly abrogated by *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), which held that ordinary pleading rules require a plaintiff to provide indication of loss and causal connection).

But even assuming that the Trustees bear the burden of proof, the evidence establishes that Trachte's stock value today is the result of the national economic recession and dramatic changes in the self-storage construction industry, and is not the result of any action by the Trustees occurring on or before August 29, 2007.

1. **Plaintiffs Cannot Prove Monetary Damages Because the $38.3 Million Purchase Price Was Fair Market Value in August 2007**

Even if the Court finds that the Trustees failed to negotiate enough, should have engaged Alpha sooner, or failed to take other actions, the Court should not award damages because the ultimate purchase price paid of $38.3 million represented the approximate fair market value of 100% of Trachte stock on August 29, 2007.

At the Phase I trial, Roseanne Aumiller from BWVS testified that she reviewed all available information and conducted an extensive valuation of Trachte. She used commonly-accepted methods of valuation, considered current sales and order data as well as general industry factors, and determined that the price of $38.3 million represented fair market value for the stock.[4] Defendants supported this conclusion with the expert testimony of Robert Gross, Senior Managing Director of Prairie Capital Advisors. Mr. Gross testified that BWVS' fair market value conclusion was supportable on its own merits and used common methods of valuation employed in 2007 for a company like Trachte. Mr. Gross' damages report filed with this Brief notes that several of BWVS' conclusions were conservative, such as the use of a 4-6x EBITDA multiple and failure to include a control premium. (Gross Supp. Rep., at pp. 5-6).[5] Mr. Gross also explained that BWVS could have used a higher long-term growth assumption in its

---

[4] Plaintiffs produced no evidence showing that Ms. Aumiller was not qualified to perform the valuation, and it was undisputed that BWVS and Ms. Aumiller were independent with respect to all parties to the 2007 Transaction.
[5] The Supplemental Expert Report of Robert Gross is attached to this Brief as Ex. 1 and cited as (Gross Supp. Rep. at pp. __).

CHICAGO/#2299603.5

calculation of the terminal value in its discounted cash flow analysis.  (Gross Supp. Rep., at pp. 5-6).

At the Phase I trial, Mr. Gross addressed Plaintiffs' criticisms of BWVS's failure to apply a discount for lack of marketability ("DLOM") and application of an ESOP tax shield.  As Mr. Gross explained, there is no consensus in the appraisal community on either issue.  Some appraisers apply a DLOM in the sale of 100% of a business; while others do not.  Mr. Gross testified that private equity purchasers and other non-ESOP market participants do not apply a DLOM when purchasing 100% of a business, which supports BWVS' position under the fair market value, willing buyer/willing seller framework.  Mr. Gross concluded that it was his opinion that BWVS' approach was reasonable.

Similarly, Mr. Gross explained that there is no consensus on the ESOP Tax Shield issue – particularly in the context of the unique ESOP-to-ESOP transaction at issue in this case.  He found BWVS' approach reasonable, though he acknowledged that valuation professionals may disagree.  Moreover, as Mr. Gross opines, just as BWVS could have decided not to apply a tax shield or to apply a DLOM, BWVS could have reasonably made the decision to apply a control premium, a higher long-term growth rate, or other adjustments that could increase the value. (Gross Supp. Rep., at pp. 4-6).  In effect, these adjustments would cancel each other out, as discussed below.

Finally, the Trustees presented evidence at trial related to negotiations between HIG and Alliance, which further shows that $38.3 million is within the range of values a third party would pay.  As the deposition testimony of Mr. Hanneman and communications from HIG showed at the Phase I trial, HIG's original offer was $40.8 million without SNS.  Following negotiations, the last offer made by HIG in April 2007 was for $32.0 million in cash with an earnout of up to

$5.5 million, and the assumption of $3.3 million in unfunded customer deposits. *See* (PX-155). If Trachte's 2007 final EBITDA (excluding SNS) is inputted into the earnout formula, HIG would have paid $39.5 million for Trachte ($32.0 [cash] + $3.3 [unfunded customer deposits] + $4.2 [prorated earnout] = $39.5 million), or 6.3 times 2006 EBITDA. *Id*. Of course, this deal never got done because Alliance walked away, a decision they may regret now. Nonetheless, the fact that HIG – an independent third-party buyer – was willing to put up $32 million in cash and a total offer of approximately $39.5 million demonstrates that the price the Trachte ESOP ultimately paid was fair market value, especially considering that HIG's offer did not include Trachte's share of SNS, which Plaintiffs' own expert admitted was worth an additional $4 million.

Plaintiffs have never presented any persuasive evidence that undercuts the Trustee's showing that the $38.3 million purchase price represented fair market value. Instead, Plaintiffs offer the testimony of Kevin Kreitzman, who opines that Trachte, including its 60% share of SNS, was only worth $16.2 million in August 2007. Kreitzman's opinion is not persuasive and obviously does not represent a number that comes close to representing fair market value, as discussed in Mr. Gross' prior testimony and report. The Trustees will not belabor the point here.

The fair market value of Trachte was approximately $38.3 million and therefore the Plan was not harmed as a result of any breach. Regardless of whether the Trustees, Alpha, or Alliance did everything perfectly – or whether the negotiations could have been structured differently – the ultimate purchase price represented fair market value for Trachte and 60% of SNS in August of 2007. Accordingly, the purchase price did not cause any loss to the participants or the Plan.

2.      **Economic Factors and Industry Conditions Caused the Decline in Trachte Stock Value, Not Any Breach or Fiduciary Action by the Trustees**

Even if the Court finds that there was an overpayment based on the ESOP tax shield or the DLOM, or finds that a breach occurred for some other reason, the Court should not award damages because the amount of any overpayment was not material and Plaintiffs have not shown that a breach caused them any loss.  ERISA Section 409(a), 29 U.S.C. § 1109(a), makes a fiduciary liable for losses to the Plan, but only those losses "resulting from" the breach alleged.  Before a monetary remedy can be imposed, however, Plaintiffs have the burden of proving that the alleged breach *caused* a loss to the plan.  *See Brandt,* 687 F.2d at 898;  *see also Leigh I*, 727 F.2d at 137.  Plaintiffs must prove that any alleged loss is causally connected to a breach under Section 404 or related to a prohibited transaction under Section 406.  *Etter v. J. Pease Construction Co., Inc*., 963 F.2d 1005, 1009 (7th Cir. 1992).  "[T]he fact that a transaction is prohibited under ERISA does not necessarily mandate a remedy…"  *Id*; *see also Leigh v. Engle*, 858 F.2d 361, 368 (7th Cir. 1988) ("*Leigh II*").

Plaintiffs have not, and cannot, show a causal connection between a breach by the Trustees and the subsequent decline of Trachte's stock a year after the transaction, when an economic market collapse pummeled Trachte's business and the demand for self-storage buildings declined by over 90%.  As explained by Mr. Mastrangelo and Mr. Seefeldt at trial, Trachte easily met its loan covenants in 2007 and closed the year with record EBITDA of $7.8 million, resulting in a higher than expected stock valuation at the close of 2007.  *See* (T1542, at Chase 004678).  Revenues, cashflow and orders remained strong in the first and second quarters of 2008 and Trachte prepaid approximately $1.4 million in senior debt ahead of schedule.

The credit crisis and national economic collapse in late 2008 had a direct and dramatic impact on Trachte.  Customer orders dropped sharply.  Plaintiffs' own witness, James Lindau,

-11-

admitted at trial that he "could never have foreseen the drop in sales that occurred in [2009] at Trachte…" (Tr. 2-B, at pp. 114, 124). The drop-off in orders was so sudden that, in late 2008, Trachte's sales team revised 2009 sales forecasts to less than half of previously forecasted amounts. In the years that followed, the self-storage construction industry changed dramatically, with more than a 90% drop in new buildings built on an annual basis in 2010 compared to pre-recession levels. As explained by Steve Kindstrom from JP Morgan Chase and Scott Miller from ESI, these market changes caused the dramatic decline in Trachte's business fortunes, not any alleged conduct by the Trustees on or before August 29, 2007.

      **B.**      **Any Award of Damages to the Plan Would Be a Windfall Because the Plan and Its Participants Would Be in the Exact Same Position Today**

The Court should not award monetary damages in this case because any recovery by the Plan would be a windfall. ERISA's limited remedial scheme and compensatory approach to remedies evidences a clear policy against "windfalls." *See Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 469 (7th Cir. 1998) (proposed method for computation of benefits would have resulted in a "pure windfall"). It is the aim of ERISA to make plaintiffs whole, not to provide a windfall. *Henry v. U.S. Trust Co. of Cal.*, 569 F.3d 96, 98 (2nd Cir. 2009). In addition, although ERISA provides courts with discretion in fashioning a remedy, ERISA requires that any remedy be "in tune with the case's realities," and should take into account ERISA's policy against windfalls. *Etter*, 963 F.2d at 1009; *see also Leigh II*, 858 F.2d at 368; *Neil v. Zell*, 767 F.Supp.2d 933, fn. 13 (N.D. Ill. 2011) ("in shaping an award, the court must be mindful of the 'windfall' concerns Defendant has expressed."); *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 667 F.Supp. 2d 850, 899 (N.D. Ill. 2009) ("Courts do not look favorably on attempts to obtain windfall recoveries…"), *aff'd*, 615 F.3d 808 (7th Cir. 2010).

The purpose of ERISA's limited remedial scheme is not to bailout banks or unjustly enrich participants for holding stock in a company that, a year after the sale, declined to zero due to a rapid decline in market conditions. The reality of this case is that the company stock fell during the economic crisis that caused declining sales and revenues at Trachte. As explained above, the value of the DLOM and ESOP tax shield adjustments is approximately $3.8 million, which the Trustees submit is the maximum reasonable range of any overpayment. However, if the parties had negotiated a deal that resulted in a sale price $3.8 million lower, Trachte, the Plan and the participants would be in the same position they are in now.

The Trachte transaction was funded primarily by using the spin-off accounts; bank financing coupled with an ESOP loan; and seller-financed subordinated promissory notes from both Alliance and Pagelow. *See* (Joint Ex. 33, at Trustees 14160-14164). The spin-off accounts accounted for $7,891,925.00 of the transaction consideration, approximately $1.58 million of which was attributable to the accounts of the Trustees and Pagelow. *Id.* JP Morgan Chase loaned $12.5 million in first lien financing and $15.0 million in second lien financing to Trachte. Trachte then loaned $26.7 million to the Trachte ESOP to fund the purchase of Trachte stock by the ESOP. *Id.* However, the remaining transaction consideration of almost $5.67 million was seller financing: Trachte redeemed the preferred and common stock from Alliance in exchange for a subordinated seller's note in the amount of $4.37 million, and purchased the remaining common shares from Pagelow in exchange for a seller's note in the amount of $1.3 million. *Id.*

 If the parties negotiated a purchase price that was $3.8 million lower – an amount that represents the tax shield and a 5% DLOM adjustment – the Plan and the participants would be in the same position that they are in today. Such a reduction would almost certainly have reduced the amount of seller financing by $3.8 million. Therefore, instead of $5.67 million in seller

CHICAGO/#2299603.5

financing, Trachte would have $1.87 million in seller financing, which would make no difference for a number of reasons.  First, the sellers' notes are not an obligation of the ESOP, they are an obligation of Trachte.  Therefore, unlike the ESOP loan, they do not create a direct obligation for the trust.  Second, reducing the purchase price and notes by $3.8 million would not have made a difference considering the substantial decline in business and resulting effect on Trachte's bank obligations and earning power.  The sellers' notes are subordinated to the bank loans and Trachte's contribution obligation under the terms of the ESOP loan.  No payment has ever been made on these notes and they are essentially worthless.  At the end of 2011, Trachte had $8.9 million in assets and approximately $29 million in bank debt.  With an EBITDA of just over $100,000, the impact of a reduction in the purchase price of $3.8 million obviously would be immaterial.  Therefore, if the parties had reduced the price by approximately $3.8 million, the participants and the Plan would be in the same unfortunate position today.

Allowing any sort of cash recovery by the Plan or the participants would therefore represent a windfall.  If this deal was done for $3.8 million less or some other like number, the participants still would have lost the value of the Trachte stock held in their accounts.  The purpose of ERISA's remedial provisions is not to insulate participants from inherent investment and business risks of the ESOP structure.  The purpose is to put participants in the position they would have been in but for the breach.  Here, even if the Court determines the parties should have negotiated a lower price, the participants are already in the position they would have been in and, therefore, no monetary remedy is appropriate.

-14-

## C.     Plaintiffs' Damages Theories are Logically Flawed and Only Further Demonstrate that Plaintiffs Seek a Windfall

As discussed below, Plaintiffs' theories of damages are fanciful and only further demonstrate that they are seeking a windfall. The Trustees address several of these points below, but as a threshold matter, there are several general points worth noting:

First, the majority of Plaintiffs' theories rest on the presumption that there was an overpayment based on Kreitzman's valuation opinion. As discussed above, Kreitzman's opinion of value is not persuasive and Plaintiffs have not rebutted Defendants' showing that $38.3 million represents fair market value. Therefore, even if the Court finds a breach under Section 404 or a prohibited transaction under Section 406, there should be no monetary remedy.

Second, Plaintiffs make absolutely no attempt to account for the impact of the greatest recession of the last 50 years and the subsequent prolonged drop in the demand for self-storage facilities on Trachte's business. This cannot be ignored.

Third, Plaintiffs continue to ignore critical issues with respect to the value of the spinoff accounts valued at $7.9 million for purposes of the 2007 Transaction. Most importantly, Plaintiffs claim for some purposes that Trachte was overvalued by over $20 million, but they assume that SRR's valuation of Trachte was correct for purposes of valuing the spinoff accounts in their damages calculations. In other words, they claim liability based on the theory that the price was too high, but then they use that same price when calculating their losses. Plaintiffs also fail to acknowledge that approximately 20% of the $7.9 million – or $1.58 million – is attributable to the account values of the Trustees and Pagelow.

Fourth, Plaintiffs incorrectly assert that any judgment of less than $25 million would not restore any value to Plan participants' account balances. *See* (Pls. Damages Br., at pp. 22-23; Kreitzman Phase II Report at ¶ 15). This argument seemingly assumes that if the Trachte ESOP

received funds, it would have to immediately distribute those funds to pay off the ESOP loan or the bank loans.  Despite the Trustees' suspicion that Plaintiffs' counsel would take a different position in the event that the Court did allow some amount to be distributed to participant accounts, Plaintiffs' argument is incorrect.  First, although the bank loans to Trachte are in default, it is noteworthy that the ESOP loan is not in default.  Trachte is making the required contributions and shares are being released.  Moreover, if the Court were to award an amount to be allocated to participant accounts, those amounts could not be used to pay down the ESOP loan or the bank loan.  ERISA's statutory scheme provides generally that ESOP acquisition loans are without recourse against the Plan with the exception of the employer stock pledged as collateral that has **not** yet been released to employee accounts.  *See* (29 C.F.R. § 2550.408b-3(h)).  The Plan and the ESOP loan incorporate these rules.  *See* (ESOP Loan and Pledge Agreement § 2.3; Plan § 6.4).  Because these rules are exemptions to the prohibited transaction rules, any attempt by the bank to recover any amounts from participant accounts would be a prohibited transaction.

Plaintiffs' various damage calculations are legally and factually flawed for the following additional reasons:

1.   **Difference Between The Price Paid And Fair Market Value on the Transaction Date**

Although the difference between fair market value at the time of the transaction and the actual price paid is often an appropriate measure of damages in ESOP cases where a prohibited transaction is found, Plaintiffs are not entitled to monetary damages in this case for several reasons discussed above.  First, the price paid here did represent fair market value.  Second, even if this Court finds an overpayment, it did not cause a loss to the Plan.  In the cases cited by Plaintiffs, the overpayment resulted in an increase to the debt taken on by the ESOP.  Therefore, as Plaintiffs point out, there could be a "loss" in the sense that the ESOP took on additional debt.

-16-

Here, however, that would not be the case because the purchase price reduction would only serve to reduce the seller financing, which was an obligation of *Trachte*, not the Trachte ESOP. Finally, it is clear that market events beginning in 2008 would have wiped out the Company no matter what the price.

Plaintiffs cite to *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 603 (8th Cir. 1995) and *Donovan v. Bierwirth*, 754 F.2d 1049, 1058 (2d. Cir. 1985) for the proposition that measurement of the loss should extend beyond the transaction date (or the "snapshot" approach). (Pls. Damages Br., at p. 11).  However, in *Roth*, the court stated that the measure of loss in a situation where the alleged breach consisted of an overpayment would be the snapshot approach. *Roth*, 61 F.3d at 603.  The *Roth* case did "not involve an overpayment…" *Id.*  Furthermore, in *Donovan,* the court stated that in cases where the purchase price exceeds the market value, the measure of loss is the difference between the fair market price and the price paid.  *Donovan*, 754 F.2d at 1054.  In *Donovan* the court found that it would be inappropriate to find the measure of loss at the moment of the sale because the price paid was at market price.  *Id* at 1054-1055. Furthermore, in *Donovan,* the plaintiffs complained that the securities purchased were improper; the purchase of Trachte stock was not an improper investment.  *Id* at 1050.  Accordingly, these cases are inapposite.

2.    <strong><u>Difference Between Price Paid and Current Market Value</u></strong>

Plaintiffs argue that the Court should award them $34 million, which they argue represents the difference between the purchase price paid by the Trachte ESOP and the current value of the Trachte stock.  This argument is frivolous.  Plaintiffs cite no authority for the idea that a court can award damages for investment losses that are not connected to a specific breach of duty under ERISA.  This type of an award would represent a windfall because, as explained

above, Trachte, the Plan, and the participants would be in the same position today even if the price was approximately $3.8 million less.

Plaintiffs rely on the unreported case of *Mohler v. Unger*, 1994 U.S. Dist. LEXIS 21697 (S.D. Ohio Aug. 26, 1994). *Mohler* is inapposite and in any event supports the Trustees' position. In *Mohler*, the court found that the seller of stock, who also served as a fiduciary for the ESOP buyer, breached his fiduciary duty. *Id* at *49. However, the court found that the ultimate demise of the ESOP was not caused by the breach. *Id.* The court stated that "[i]t is the nature of an ESOP to suffer the ups and downs of the fortunes of the employer company as reflected in the value of its employer stock assets. Bad business judgments, temporary market conditions, and myriad of other factors may cause the value of the employer's stock to fluctuate." *Id.* The court stated that the plaintiffs' failed to establish the necessary nexus between the lost value of the ESOP shares and the fiduciary's breach. Therefore, the plaintiffs' claim for the lost value of the shares failed. *Id* at *50. The court did, however, find liability because of a prohibited transaction and ordered the fiduciaries (who were also the sellers) to repay the amounts received. Significantly, the Court stated that "the fair market value of the securities and other income therefrom on the date of the transfer…shall constitute a credit against the obligation" to repay the amounts received. Therefore, *Mohler* is inapposite because it involves a case where the fiduciary was also the seller and, in any event, the Court ordered that the value of the amount to be paid back should be reduced by the fair market value of the stock. Moreover, unlike the defendant in *Mohler*, the Trustees did not engage in any self-dealing or obtain any profits to be disgorged. This case does not support Plaintiffs' $34 million windfall theory.

-18-

More importantly, Plaintiff's theory is wrong for a host of other reasons discussed above. First, it ignores that, as of August 29, 2007, the ESOP received 100% of the stock of a successful company. As explained above, the fair market value of this Company was $38.3 million (or very close to it) and, therefore, Plaintiffs are not entitled to damages. Second, Plaintiffs seek to recover the $7.9 million in spin-off account values. As discussed above, the $7.9 million number assumes that SRR's valuation of Trachte was correct. If that value is correct, then Plaintiffs are not entitled to any damages because Trachte was worth at least what was paid for it. Plaintiffs' theory also fails to take into account the 20% of this value attributable to the accounts of the Trustees and Pagelow.

### 3. Difference Between What The Plan Earned And What A Prudent Investment Would Have Earned

The Plaintiffs also claim one measure of loss as the difference between what the Plan earned and what a "prudent investment" would have earned. Although this approach is sometimes used in ERISA cases, it generally makes no sense in the ESOP context. In this case, the Plan states that the assets of the Plan must be invested primarily in employer stock. Of course, the fiduciaries of an ESOP need to exercise prudence in making the decision to purchase employer stock and must pay no more than fair market value for the stock. Here, even if the Court found an overpayment, an "alternative investment theory" would be inappropriate because the ESOP plan does not allow for such an alternative investment. Moreover, Plaintiffs cite no authority to support an alternative investment award and the Trustees are unaware of any decision where such a theory was actually used as a basis for an award of damages in the leveraged ESOP context.[6]

---

[6] This theory was discussed in *Reich v. Valley Nat'l Bank of Arizona*, 837 F.Supp. 1259, 1289 (S.D.N.Y. 1993). However, in that case, the court stated that this measure of damages is reserved for situations where the breaching

(cont'd)

CHICAGO/#2299603.5

4.      **Total "Contributions" Including Payments Made on the ESOP Loan**

Plaintiffs' next theory is that damages should equal the "contributions received by the ESOP" equal to $7.9 million in initial account balances plus contributions from Trachte since August 2007.  This theory is unsupported by applicable legal precedent and fatally flawed in its factual underpinnings.  As previously shown, the $7.9 million initial account balance figure includes Pagelow and the Trustees' accounts and is based on SRR's valuation.  The contributions made since the transaction are all pegged to the transaction value, so participants have received exactly what they are entitled to receive, i.e., shares of Trachte stock.  The fact that such stock has lost its value is not due to any breach of duty.

The only case cited by Plaintiffs for this theory of damages is *Reich v. Valley Nat. Bank*, 837 F.Supp. 1259 (S.D.N.Y. 1993).  However, the facts of that case are completely inapposite and the court specifically stated that where the breach of duty is nothing more than an overpayment, the measure of loss is "the difference between the price paid and the price that should have been paid."  *Id* at 1289.

D.      **Rescission Is Not An Available Remedy As To The Trustees**

Plaintiffs make a brief perfunctory argument that the Trustees should be required to "rescind" the transaction "to the extent possible" by "returning approximately $28 million in consideration which the Trachte ESOP gave to AHI and Alliance…"  (Pls. Damages Br. at pp. 19-20).  The short answer to this is:  the Trustees did not receive proceeds and there can be no rescission as to them.  Plaintiffs really are only seeking money damages from the Trustees, not

---

(cont'd)

fiduciary has been found to commit a misfeasance beyond paying too high of a price.  *Id*.  Plaintiffs have not shown that is the case here.

CHICAGO/#2299603.5

rescission.  We will leave it to the Alliance Defendants to argue about rescission and tracing of proceeds.

### E.    Removal And Permanent Injunction Barring Service As A Fiduciary

The Plaintiffs also seek a permanent injunction removing the Trustees from serving as fiduciaries.  The Trustees acted in good faith and did not do anything that would warrant their removal as fiduciaries.  Plaintiffs have not shown any adverse impacts which participants are expected to suffer in the future if the Trustees are not removed from office.  Moreover, the Court should consider whether, practically speaking, there are other competent people willing and able to act at Trustees to the Plan.  Most important, it seems to be a waste of the Court's time to explore this option in depth, given the fact that Trachte's stock has no value and will not have value for the foreseeable future.

### F.    Plaintiffs' Claim for Prejudgment Interest (or the "Present Value of Their Alleged Loss") Should Be Denied

Plaintiffs have requested prejudgment interest (Pls. Damages Br. at p.18), but in the interest of equity, prejudgment interest is inappropriate in this case, even assuming *arguendo* that this Court awards damages. Furthermore, even if Plaintiffs could show that prejudgment interest is warranted, they have proposed an inappropriate rate at which to calculate it.

#### 1.    Prejudgment Interest is Not Warranted in this Case

Trial courts have discretion to award prejudgment interest in ERISA cases, but the issue is "a question of fairness . . . to be answered by balancing the equities" in order to prevent unjust enrichment.  *Trustmark Life Ins. Co. v. Univ. of Chi. Hosps.*, 207 F. 3d 876, 885 (7th Cir. 2000).  Courts have considered several factors when deciding the issue, including the remedial purpose of the statute, the need to fully compensate the wronged party, the relative equities of the award, the presence or absence of bad faith or goodwill, undue delay by the prevailing party, and the

-21-

likelihood of unjust enrichment.  *See Trustmark*, 207 F.3d at 885 (the presence or absence of bad faith, as well as the presence or absence of unjust enrichment, are factors in determining whether to award prejudgment interest); *White v. Martin*, 290 F.Supp.2d 986, 989 (D. Minn. 2003) (whether a wrongdoer keeps the earnings or has use of the claimant's funds during the time of the dispute is relevant in determining prejudgment interest).  Here, the Trustees have not acted in bad faith and did not benefit or profit from any fiduciary breach, and Plaintiffs will be fully compensated without prejudgment interest.

First and foremost, an award of prejudgment interest is not necessary to make the Plaintiffs whole in this case.  Even assuming *arguendo* that a breach of fiduciary duty occurred on the transaction date due to an overpayment, it is quite clear that the Trachte stock which was acquired by the Trachte ESOP has declined in value.  This is not a case in which Plaintiffs should be compensated for opportunity costs or profits that they would have earned, absent a breach of fiduciary duty, because they would not have earned a penny on their ESOP accounts since the transaction date.

Moreover, the Trustees were not unjustly enriched because they did not profit from any fiduciary breach.  *See Trustmark*, 207 F.3d at 885 (agreeing with the district court that the defendant was not unjustly enriched, and upholding the decision not to award prejudgment interest).  Courts have denied prejudgment interest where the wrongdoer did not keep the earnings or have use of the funds during the prejudgment period.  *White*, 290 F. Supp. 2d at 989-90.

Further, there is no evidence that the Trustee Defendants acted in bad faith.  While bad faith is not the only factor that a court considers when determining whether to award prejudgment interest, it is certainly "[o]ne of the factors to be considered."  *See Trustmark*, 207

F.3d at 885 (finding that there was no evidence of bad faith in upholding a denial of prejudgment interest).  Accordingly, prejudgment interest should be denied.

2.    **If Plaintiffs Are Awarded Prejudgment Interest, It Should Be At the Prime Rate, Approximately 3.25%**

Assuming *arguendo* that Plaintiffs are entitled to prejudgment interest in this case, Plaintiffs apply an excessive interest rate.  Plaintiffs' expert has proposed a calculation of prejudgment interest based on a rate of return of U.S. Treasury securities purchased on August 29, 2007 which equates to an interest rate of approximately 4.633%.  Apart from the fact that Plaintiffs' approach would create a windfall in a capital markets environment in which equities generally decreased in value, courts in the Seventh Circuit do not typically apply Plaintiffs' method to calculate prejudgment interest.

In the Seventh Circuit, it is general practice to use the prime rate to calculate prejudgment interest, unless the district court engages in "refined rate-setting." *First Nat'l Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999).  This district court (per Judge Crabb) recently opted to use the prime rate on the date of judgment, indicating that it is more appropriate to apply a single interest rate to the class rather than spending time calculating the average rate over time for each plaintiff. *Ruppert v. Alliant Energy Cash Balance*, 716 F. Supp. 2d 801, 830 (W.D. Wis. 2010).  If this Court determines that it should award prejudgment interest, Defendants ask this court to use the current prime rate, 3.25%.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs have not proven that any loss to the Plan or the participant class was a result of the actions of the Trustees.  Moreover, the purchase price of $38.3 million represented fair market value for 100% of Trachte stock and 60% of SNS in August of 2007, and a reduction in the price by $3.8 million or some similar number would not

have put the participant class in a better position today.   Therefore, monetary damages are not appropriate.

In their Damages Brief, Plaintiffs do not even attempt to address the economic recession and industry factors that have devastated this Company – because the reason for Trachte's current financial situation are obvious:   Revenues did not drop by 50%, and hover at approximately $30 million for three straight years because the Trustees did not negotiate hard enough before the transaction.   Trachte's customer base has not had difficulty financing projects because BWVS applied an ESOP tax shield.   Trachte's EBITDA did not drop to a fraction of  its pre-recession performance because Alpha was referred in August instead of April 2007. Trachte's weakened condition is a result of the economic recession and the dramatic shift in the demand for steel self-storage facilities.   When this demand will rebound is anybody's guess, but there is no question that it is this industry collapse that caused Trachte's problems, not any alleged breach of fiduciary duty which occurred in 2007.

Respectfully submitted,

JAMES MASTRANGELO, PAMELA KLUTE, and JEFFREY A. SEEFELDT

By:  /s/ Charles B. Wolf
                    One of Their Attorneys

Lynn M. Stathas
Reinhart Boerner Van Deuren S.C.
22 East Mifflin Street, Suite 600
Madison, WI  53703
(608) 229-2205
Fax:  (608) 229-2100

-24-

Charles B. Wolf, Bar No. 03057402
Patrick W. Spangler No. 6290810
Benjamin A. Hartsock No. 6299979
Vedder Price P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois  60601-1003
(312) 609-7500

Dated:     March 15, 2012