IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CAROL CHESEMORE, DANIEL DONKLE,
THOMAS GIECK, MARTIN ROBBINS and
NANNETTE STOFLET, on behalf of themselves,
individually, and on behalf of all others similarly
situated,

|  |  |
|---|---|
| Plaintiffs, | OPINION AND ORDER |
| v. | 09-cv-413-wmc |

ALLIANCE HOLDINGS, INC., A.H.I., INC.,
AH TRANSITION CORP., DAVID B. FENKELL,
PAMELA KLUTE, JAMES MASTRANGELO, and
JEFFREY A. SEEFELDT,

Defendants,

and

TRACHTE BUILDING SYSTEMS, INC.
EMPLOYEE STOCK OWNERSHIP PLAN
and ALLIANCE HOLDINGS, INC.
EMPLOYEE STOCK OWNERSHIP PLAN,

Nominal Defendants.

---

In an order entered July 24, 2012, the court found that defendants Alliance

Holdings, Inc., A.H.I., Inc., AH Transition Corp., David B. Fenkell, Pamela Klute, James

Mastrangelo, and Jeffrey A. Seefeldt had violated various fiduciary duties owed to the

Trachte Building Systems, Inc. Employee Stock Ownership Plan ("Trachte ESOP") and

to the Alliance Holdings, Inc. Employee Stock Ownership Plan ("Alliance ESOP") in

conjunction with a complex leveraged buyout. (Dkt. #733.)  More specifically, the court

found that defendants leveraged plaintiff's accounts in the Alliance ESOP to purchase Trachte Building Systems, Inc. on behalf of the Trachte ESOP at a substantially-inflated price. Following the court's ruling on liability, a bench trial was held from July 25 to July 30, 2012, to determine the extent of the plaintiffs' losses and the appropriate remedies.

While plaintiffs continue to carry the burden of proof on damages, the requirement of precision -- particularly with respect to uncertainties in valuation -- is not as great. Once plaintiffs prove that defendants caused harm to the plan, uncertainty about the extent of that harm should be resolved in plaintiffs' favor. Here, the court concludes plaintiffs have proven that defendants' breach of their duties to the Alliance and Trachte ESOPs caused the Trachte ESOP to overpay for the purchase of Trachte and that overpayment can be reasonably estimated at $8,329,477.53.

Because defendants Alliance and Fenkell used their control over the Trachte employees' accounts in the Alliance ESOP and the Trachte ESOP trustees to obtain an inflated price and ensure payment of phantom stock, the court will order Alliance and Fenkell to reinstate plaintiffs in the Alliance ESOP and restore $7,803,543 to their accounts; order Fenkell to disgorge the $2,896,000 he received in phantom stock payments; and order the removal of Fenkell as trustee of the Alliance ESOP. Because defendants Mastrangelo's, Seefeldt's and Klute's breach of their fiduciary duties caused the Trachte ESOP to overpay for Trachte, they must restore $6,772,554.63 to the Trachte ESOP, which represents the amount it overpaid reduced by the share of the consideration paid through the share exchange with the employee accounts. However, because Alliance and Fenkell were the more culpable fiduciaries, the court will order

2

Alliance and Fenkell to indemnify Mastrangelo, Seefeldt and Klute for any compensatory relief paid.

FACTS

The court assumes familiarity with the findings of fact and conclusions of law set forth in its liability ruling.  Based on the evidence presented during the remedies phase of trial, the court makes the following additional findings of fact and conclusions of law.

## A. Trachte's Fair Market Value In 2007

In the 2007 Transaction, Trachte and the Trachte ESOP paid $38,329,447.53 for 100% of Trachte's common equity.  That amount represents the total consideration paid by Trachte and the Trachte ESOP, minus the $2 million worth of preferred equity and the $4,905,300 paid to Alliance employees for the phantom stock plan.

While valuation of a business is decidedly an art and not a science, especially when one is required to look back without the benefit of an arms-length sale, the parties and their experts offered wildly, at times absurdly, different approaches to Trachte's fair market value.  Ultimately, the court finds two methods helpful in determining a reasonable estimate of Trachte's fair market value at the time of the 2007 Transaction.[1]

───────────────

[1] As indicated during the remedies trial, the court had hoped to compare the 2007 Transaction to the 2002 Transaction, the last occasion on which Trachte was sold in a true arms-length transaction.  Unfortunately, because the record lacks critical evidence about Trachte's financial performance in the years leading up to the 2002 sale and because of materially different financing used in the two transactions, no meaningful comparison ultimately proved possible.

### 1. Adjusting for Errors in the Barnes Wendling's Fairness Opinion

The first method corrects four errors in Barnes Wendling's calculation of the range of fair market values for Trachte's common equity.   One way to correct Barnes Wendling's opinion is to subtract those errors from its conclusion of Trachte's common equity value.  First, the court will subtract $1,908,610 for the tax shield.  The tax shield was a benefit to the Trachte ESOP by virtue of its special tax status, but the calculation of fair market value does not typically include features unique to an individual buyer. The court will also subtract $1.7 million as a reasonable estimate of Trachte's operating capital needs.  During its calculation of common equity, Barnes Wendling added $6.2 million in value from Trachte's holding in cash and cash equivalents while subtracting $4.5 million for its customer deposits, mistakenly assuming that Trachte had no need for operating cash beyond customer deposits and unrealistically treating all of its cash in excess of customer deposits as an asset.[2]  Finally, the court will apply a 10% discount for lack of marketability.  While valuators must use judgment to determine the amount of the discount, the expert testimony indicated that discounts ranged from 1 to 10%.  A discount at the high end of the range was appropriate for Trachte, since a private auction had failed to produce a price acceptable to the seller only a few months before this insider transaction.

---

[2] While defendants argue that Barnes Wendling included a working capital estimate in its discounted cash flow analysis, Barnes Wendling's work papers show that it subtracted an estimated increase in Trachte's working capital as part of the DCF analysis (based on an estimated working capital to revenue ratio of 6%), not that it set aside any of Trachte's cash for working capital. (Trustee Ex. 1521 (dkt. # 591-5) 2.)

While even defendants' expert Robert Gross characterized these errors as "aggressive judgments," defendants argue they should be offset by what Gross identified as Barnes Wendling's other, more conservative judgments.  The court disagrees.  For example, while Gross testified that some appraisers would have applied a premium because the Trachte ESOP obtained a controlling share, Barnes Wendling performed its discounted cash flow analysis on a controlling interest basis, so no additional premium would have been appropriate.  Gross also testified that Barnes Wendling assumed conservatively that Trachte would experience long term growth of 3%, which was lower than management's projections and Trachte's actual growth between 2002 and 2006.  Management's judgments on future growth were highly suspect, however, both because of their own conflicts and those of Alliance and Fenkell, whose control over the actions of new management was virtually total until all steps of the sales transaction were completed.  More importantly, the court already found that during the short time it owned Trachte between 2002 and 2007, Alliance had aggressively expanded Trachte's sales (with no material increase in total net profits to show for it) in anticipation of its sale and did so in what was already a mature market with little or no prospect for further growth.  For these reasons, the court finds that a reasonable arms-length buyer would have found a projected 3% growth rate appropriate at best and unreasonably rosy at worst.  Finally, Gross testified that Barnes Wendling used conservative EBITDA multiples, but (1) offered no opinion or analysis to support this opinion and (2) provided

no guidance to the court as to more appropriate multiples.[3]

As illustrated in the following chart, when the Barnes Wendling valuation is adjusted consistent with the above discussion, it supports a range of $20,315,067 to $32,817,601 for Trachte's common equity, with a median of $26,566,334.

### Deducting Mistakes from BWVS' Calculation of Common Equity Value

|  | Low | High | Median |
|---|---|---|---|
| Value of Common Equity  as Calculated by BWVS | $26,180,907 | $40,072,611 | $33,126,759 |
| Tax Shield | ($1,908,610) | ($1,908,610) | ($1,908,610) |
| Operating Cash[4] | ($1,700,000) | ($1,700,000) | ($1,700,000) |
| 10% Marketability Discount | ($2,257,230) | ($3,646,400) | ($2,951,815) |
| **FMV:** | **$20,315,067** | **$32,817,601** | **$26,566,334** |
| **Overpayment:** | **$18,014,380** | **$5,511,847** | **$11,763,113** |

---

[3] Although less crucial to total value after discounting to present value, Gross also offered no opinion about the appropriate terminal growth rate or explanation of how an "appropriate rate" would change Trachte's value.  In arguing for an even lower valuation, plaintiffs' argue that Barnes Wendling should have treated Pagelow's put option as a liability of Trachte and deducted from Trachte's common equity.  This argument underscores a question in dispute among valuation experts themselves: whether a put option should be carried as a liability at present value with the non-controlling interest reduced accordingly; or whether the non-controlling interest subject to the put option continues to exist until the option is exercised and thus should be considered part of equity.  On this, the court gives the benefit of the doubt to defendants.  Plaintiffs also argued that Barnes Wendling made several additional mistakes in their discounted cash flow analysis.  In particular, their expert opined that Barnes Wendling should have reduced by approximately $7 million the present value of future capital investments necessary to support a 3% terminal growth rate.  Whatever merit there may be in this approach, a reduction here is inconsistent with the Trachte valuations performed outside the litigation context, both before and after the 2007 Transaction.

[4] Alternatively, to correct for the actual values of $4.977 cash and $5.245 of customer deposits on August 29, 2007, one might add an additional $268,000 of working capital.

6

Defendants urge the court to use the high end of this valuation range, but it would be unfair to give defendants the benefit of the range of permissible values after they breached their fiduciary obligation to determine fair market value. The court finds use of the median value fair for purposes of determining damages.

As in Barnes Wendling's original report, this analysis still produces an unrealistically large range of values -- in part because Barnes Wendling compiled its range by taking the highest value under the discounted cash flow model and the lowest value under the market approach. This odd choice allowed Barnes Wendling to find a particularly high end value, which it then relied upon to justify the ultimate high-end value assigned to the transaction for the fairness opinion. In comparison, SRR calculated its range of value by averaging the high and low ends of the discounted cash flow analysis and the market approach.

One way to fix Barnes Wendling's mistakes and avoid its wide range of values is to recalculate Trachte's common equity using SRR's method for estimating Trachte's total invested capital.

### Fixing BWVS Common Equity Adjustments

|  | low | high | Median |
|---|---|---|---|
| BWVS Market Approach | $25,122,788 | $37,684,182 | $31,403,485 |
| BWVS Discounted Cash Flow | 37,500,000 | 41,700,000 | 39,600,000 |
| 50% market; 50% DCF | 31,311,394 | 39,692,091 | 35,501,743 |
|  |  |  |  |
| Total invested capital | 31,311,394 | 39,692,091 | 35,501,743 |
| Trachte only debt as of 6/15 | (2,311,265) | (2,311,265) | (2,311,265) |
| CVS Ins | 200,000 | 200,000 | 200,000 |
| Intercompany receivable SNS | 2,425,000 | 2,425,000 | 2,425,000 |

| | | | |
|---|---:|---:|---:|
| 60% SNS | 4,197,000 | 4,197,000 | 4,197,000 |
| Preferred equity | (2,000,000) | (2,000,000) | (2,000,000) |
| Phantom Stock for Trachte | (980,246) | (1,229,217) | (1,104,732) |
| Phantom Stock for Alliance | (3,299,496) | (4,137,529) | (3,718,512) |
| | 29,542,387 | 36,836,080 | 33,189,233 |
| 10% marketability discount | 26,588,148 | 33,152,472 | 29,870,310 |
| **Overpayment:** | **11,741,300** | **5,176,975** | **8,459,137** |

Adoption of this method would also correct for another mistake made by Barnes Wendling in assuming the Phantom Stock Plans were 6% and 10% of the total equity minus the preferred equity for Trachte and Alliance employees respectively.  In fact, the plan uses its own elaborate formula bearing no resemblance to the Barnes Wendling formula.[5]  With these adjustments, the chart more realistically reflects a range of $26,588,148 to $33,152,472, with a median of $29,870,310.  Taking the average of these two attempts to correct the Barnes Wendling's analysis suggests a fair market value for Trachte's common equity of $28,218,322 with an overpayment of $10,111,125.

## 2. Adjusting the HIG Offer

A second method to determine Trachte's fair market value on December 31, 2006, is to look to HIG's letter of intent.  Although never consummated, this resulted from true arms-length negotiations only months before the orchestrated sale.  HIG's final, revised letter of intent proposed a purchase of Trachte for $32 million in cash, $3.3 million in unfunded customer deposits and a $5.5 million earn-out dependent on Trachte's

---

[5] The chart above uses a recalculation of the phantom stock plan liabilities that accurately reflect the plan terms and those calculations are set forth in the appendix.

performance in 2007. (Joint Ex. 36 (dkt. #590).) Under the terms of the earn-out, Alliance would receive (1) a maximum of $5.5 million if Trachte achieved its projected 2007 EBITDA of $8.16 million, (2) nothing if it fell below its 2006 EBITDA,[6] and (3) a prorated amount to the extent its EBITDA fell somewhere between these two figures.[7]

Several adjustments to the base price are necessary to compare HIG's offer to the 2007 Transaction price. First, the base offer must be reduced by an additional $1.2 million to include the higher customer deposits that Alliance would have been required to assume given Trachte's actual, unfunded deposits at the time of sale. Second, HIG's offer must be reduced to reflect the exclusion of phantom stock payments, which the letter of intent required be subtracted from the purchase price. (HIG Proposed Stock Purchase (dkt. #595-6) 13.) Third, unlike the Trachte ESOP offer, the HIG offer excluded Trachte's 60% interest in Store-N-Save, which Stout Risius and Ross valued at $4.2 million. As shown in the following chart, the actual value of the HIG offer was, therefore, somewhere between $30,955,558 and $35,742,190, depending on how confident Alliance was about Trachte's projections.

---

[6] HIG used a $6.48 million EBITDA for 2006, but SRR concluded it was $6.43.
[7] The prorated earn-out would have been calculated according to the following formula: $5.5 million x (2007 EBITDA - $6.48 million)/$1.68 million.

**HIG Offer**

|  | | Low | high |
|---|---|---|---|
| cash | | $32,000,000 | $32,000,000 |
| unfunded deposits | | $3,300,000 | $3,300,000 |
| earn-out | | $0 | $5,500,000 |
| | consideration | $35,300,000 | $40,800,000 |
| | | | |
| *Adjustments to compare to 2007 Transaction* | | | |
| | Preferred stock | ($2,000,000) | ($2,000,000) |
| | Trachte phantom stock[a] | ($1,223,421) | ($1,386,813) |
| | Alliance phantom stock[a] | ($4,118,020) | ($4,667,996) |
| | additional deposits | ($1,200,000) | ($1,200,000) |
| | | | |
| 60% interest in SNS | | $4,197,000 | $4,197,000 |
| | | | |
| | **Value** | $30,955,558 | $35,742,190 |
| | **Overpayment** | **$7,373,889** | **$2,587,257** |

Unlike Barnes Wendling's fairness opinion, the court finds an appropriate value to assign HIG's offer falls at the bottom of the range.  As an initial matter, Alliance regarded the rosy projections for Trachte's future profitability as shaky.  In particular, Fenkell expressed doubts about Trachte's ability to meet those projections in the fall of 2006 and for good reason.  In the spring of 2007, Trachte's EBITDA was on pace to exceed the 2006 EBITDA but management predicted Trachte would not meet its projected revenue figures.  Moreover, once sold, HIG would have control over the timing for booking costs and revenues in Trachte's 2007 or 2008 fiscal years, something Fenkell certainly knew.  Most telling for this court was Fenkell's testimony at trial -- in response to the court's question -- that he could not remember what value he personally assigned to the HIG earn-out opportunity.   Given Fenkell's otherwise remarkable memory for details

(particularly the financial, regulatory and fiduciary aspects of his companies' acquisitions) the court finds that response incredible.  For example, when asked about various other, smaller and unrelated transactions that fell apart in the late stages of negotiations over the years, Fenkell volunteered very specific reasons for Alliance walking away.  As a matter of fact, the court concludes, therefore, that Fenkell and Alliance assigned little or no value to the earn-out provision and for very good reasons.[8]

Indeed, Alliance walked away from HIG's offer in part *because* Alliance and Fenkell saw little or no value in the earn-out.  Even assuming that Alliance believed Trachte might meet or slightly exceed its 2006 EBITDA, the value of the earn-out was approximately $750,000 for purposes of determining damages.  Consequently, the court concludes HIG assigned a fair market value to Trachte's common equity, including its interest in SNS, of approximately $31,705,558.20, which would mean that the Trachte

---

[8] Pointing to Trachte's actual 2007 EBITDA of $7.76 million, the Trachte Trustee Defendants argue that the earn-out should be assigned a prorated value of $4.19 million, the amount that Alliance would have earned based on the proposed formula.  The actual value of the HIG offer may not be viewed in hindsight, but instead should be viewed in light of Alliance's real concerns at the time, since uncertainty was a factor in valuation.  Even with the benefit of hindsight, Alliance's concerns were justified.  Trachte earned 6% less gross revenue in 2007 than 2006.  Only aggressive cost-cutting by management kept Trachte's EBITDA above its 2006 levels.   Trachte reduced marketing and incentive programs, made the 401K contributions discretionary and then chose not to make contributions.  Cutting the 401k plan alone saved Trachte more than $1 million.  With $1 million less EBITDA, the proposed earn out would have been only $916,667.  As previously noted and as Fenkell feared at the time he was considering the value of the transaction, HIG would also have had a strong incentive *not* to inflate Trachte's EBITDA by cutting these programs, unlike Trachte's management, who needed rosy numbers to appease Trachte's bank after its highly-leveraged acquisition by the new ESOP.

ESOP overpaid by around $6,623,889.33.[9]

Taking the average of the median of the BWVS adjusted valuation and HIG's actual offer suggests that fair market value for Trachte's common equity was approximately $30 million.   Since the price paid for Trachte's common equity was $38,329,477.53, the court finds as a matter of fact that the resulting total overpayment by Trachte and the Trachte ESOP is $8,329,477.53.[10]

## B. Trachte's Performance after the 2007 Transaction

After the 2007 Transaction, Trachte had around $40 million in debt and only $16 million in assets.  Trachte met its loan covenants and preferred interest rate payments at the close of 2007 and even made a $1.4 million prepayment of its senior debt in the middle of 2008.  While there were signs of trouble for Trachte in late 2006 and in 2007, no one foresaw the extent of the 2008 financial crash or the devastating effect it would have on the self-storage market and Trachte's business.  Along with the construction and

---

[9]  As a sophisticated buyer, HIG's final offer probably included some discount based on its assumption that Fenkell and Alliance would value the certainty of an arms-length sale, and Fenkell clearly valued it that way, even without the benefit of hindsight.  The court has not adjusted for this factor for a number of reasons.  As an initial matter, the objective is to determine Trachte's fair market value, which should *not* factor in unique characteristics of the buyer or seller.  Moreover, HIG's offer is already arguably "high" in that it far exceeded other third-party offers for the Trachte business.  Finally, assigning a number to this value is simply too uncertain on the facts here.

[10]  Admittedly, *any* calculation of value is subject to criticism, certainly this court's included, making a finding of overpayment to the penny almost comical.  For the reasons stated, however, the court, as the trier of fact, reached this number based on a preponderance of the evidence before it fully cognizant of that inherent limitation, the factual uncertainties created by defendants' breaches and the obligation to resolve uncertainties in plaintiffs' favor as to the *extent* of the harm caused.

real estate markets generally, the market for self-storage units collapsed in dramatic fashion as Trachte's customer base, consisting primarily of small real estate investors and entrepreneurs, lost the ability to get credit.  In fact, the number of units built fell from 3,000 in 2006 to 200 in 2010.  Trachte's revenue in 2009 fell more than 50% compared to 2007 and sales hovered around $33.4 million in 2009, 2010 and 2011, with EBITDA between $0 and $150,000.

At the end of 2011, Trachte had $29 million in bank debt, primarily from the acquisition, and only $8.9 million in assets.  Trachte remains operational and has entered into forbearance agreements with J.P. Morgan Chase, but Trachte common stock was valued at $0 at the end of 2009 and remains worthless.  Nevertheless, the Trachte ESOP continues to repay the loan to Trachte by designating employee contributions to the release of Trachte stock at the price set in the 2007 Transaction.  By December 2011, the Trachte ESOP had repaid approximately $5 million.

### C. Alternatives to the 2007 Transaction

If defendants had not orchestrated the 2007 Transaction in violation of their fiduciary duties, Alliance had three realistic alternatives:  (1) sell Trachte to a third party at a lower price; (2) appoint independent trustees and negotiate with a Trachte ESOP at a lower price; or (3) refinance Trachte.

An arms-length sale at a lower price was the most likely and preferred alternative. By 2007, Alliance and Fenkell were very eager to sell Trachte for a variety of reasons. First, the book valuation of Trachte had begun to exceed 50% of Alliance's overall

holdings.  Second, Alliance's business model called for a sale by this time.  Third, Alliance and Fenkell were wary of holding Trachte further given their lowering expectations about its future performance.  Fourth, Alliance and Fenkell were originally unwilling to even consider a purchase by a new Trachte ESOP, no doubt wanting a clean break and realization of profit from this investment and aware of the inherit cumbersomeness, fiduciary responsibilities and risks of litigation from orchestrating an ESOP sale.

If Trachte had sold to a third party, plaintiffs likely would have remained participants in the Alliance ESOP as contemplated in HIG's proposed purchase, but their accounts would have accrued no more shares and likely would have been redeemed in 20% increments over five years at the share price set by the annual valuation process.  As a result, Trachte employee participants in the Alliance ESOP would probably have received roughly the value of the $7.8 million in their participant accounts as determined by annual valuations.  In addition, a third-party buyer was unlikely to exercise its discretion to pay the phantom stock plan.  HIG's letter of intent, for example, expressly subtracted the phantom stock liability from the purchase price.

Alliance's second option would have been to pursue an ESOP purchase, but under the court's hypothetical transaction Alliance would have had to appoint a truly independent trustee to represent the interests of the Trachte employees holding a stake in the Alliance ESOP.  An independent trustee would have been substantially less likely to have allowed those interests to be put at risk to facilitate an already highly-leveraged transaction.  Without Alliance offering the Trachte employee accounts as leverage, it is unclear whether the Trachte Trustee Defendants could have obtained bank financing for

14

an ESOP purchase.   In any case, the ESOP purchase would have proceeded at a substantially lower price.

Alliance's third option would have been to refinance Trachte to obtain the liquidity necessary to satisfy Pagelow's put option and pursue other investments.   While Chase had shown its willingness to extend such a loan under this scenario, there would have been no triggering event under the phantom stock plan and no payout to Fenkell or the other Alliance employees, a truly unappetizing alternative since this, too, is part of Alliance's and Fenkell's business model.   In addition, the Trachte employees would have remained in the Alliance ESOP and continued to accrue shares in Alliance and AH Transition.   This would likely have been the most profitable outcome for plaintiffs, but also the least likely given the strong motivations by Alliance management to offload Trachte from its books.   Nor have plaintiffs offered a viable method to value their accounts had Alliance refinanced Trachte.[11]

---

[11] The value of those accounts cannot, as plaintiffs contend, be reasonably determined by simply multiplying the number of 2007 shares by Alliance's share price based on its 2010 annual valuation, because that valuation assumes Alliance received the proceeds from the actual sale of Trachte, which the court has already found was unreasonably inflated. Since Trachte's value represented 45% of Alliance's holdings, its share price would have certainly fallen with Trachte's collapsing revenues after 2008.   On the other hand, Alliance's share price would not have fallen 45%, as defendants' contend, because Alliance would have reinvested the loan proceeds as it did the proceeds of the 2007 Transaction.   At this point, speculation about what would have happened to Alliance's share price becomes rank and, in the court's view, makes it an untenable method to arrive at a fair damage award.

## OPINION

### I.  Available Remedies under ERISA

Section 502(a)(2) of ERISA, 29 U.S.C. §1132(a)(2), authorizes participants to bring civil actions against fiduciaries "for appropriate relief under [ERISA § 409]." Section 409 states that a breaching fiduciary "shall be personally liable" to (1) "make good to such plan any losses to the plan resulting from each such breach," (2) "restore to such plan any profits . . . made through use of assets of the plan," and (3) "be subject to such other equitable or remedial relief as the court may deem appropriate, including removal." 29 U.S.C.A. § 1109(a). *See also Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 303 (7th Cir. 1985).   The Seventh Circuit has explained that "other equitable or remedial relief" language in § 409(a) "grants courts the power to shape an award so as to make the injured plan whole while at the same time apportioning the damages equitably between the wrongdoers." *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984) (finding right to indemnification among fiduciaries based on relative culpability).

Civil actions brought against non-fiduciaries must be brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which authorizes participants to sue only for "other appropriate equitable relief." The Supreme Court has confined civil actions under § 502(a)(3) to "those categories of relief that, traditionally speaking (i.e. prior to the merger of law and equity) were typically available in equity." *CIGNA Corp. v. Amara*, 131 S.Ct. 1866, 1878 (2011).   This relief includes injunction, rescission, reformation, equitable estoppel and "surcharge," which is "monetary 'compensation' for a loss

resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Id.* at 1879.

An ERISA plan may also recover *benefits* to which its participants are entitled but not "extracontractual damages," such as punitive damages or damages for emotional distress. *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804 (7th Cir. 2007) (quotation omitted). In defined-contribution plans, such as the Trachte ESOP, breaching fiduciaries are liable for "the difference between what the retirement account was worth when the employee retired and cashed it out and what it would have been worth then had it not been for the breach of fiduciary duty." *Harzewski*, 489 F.3d at 807. *See also Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust.").

Although a plaintiff must prove by a preponderance of the evidence that defendants' fiduciary breaches caused harm to the plan, see *CIGNA Corp.*, 131 S. Ct. at 1881, any doubt or ambiguity in estimating the extent of that loss should be resolved against the breaching fiduciary that caused the uncertainty. *Bierwirth*, 754 F.2d at 1056; *Sec'y of U.S. Dept. of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir. 2002); *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995); *Kim v. Fujikawa*, 871 F.2d 1427, 1430-31 (9th Cir. 1989); See also *Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984) ("*Leigh I*") (plaintiff seeking disgorgement must prove "causal connection" between use of plan assets and fiduciary's "profit," but breaching fiduciary has burden to show which

profits were attributable to its investments and court "should resolve doubts in favor of the plaintiffs").

## II. Calculating Plaintiffs' Damages

There are several possible ways to measure plaintiffs' damages. One measure would be to compare the plan's actual performance following the breach with a hypothetical alternative investment. *Bierwirth*, 754 F.2d at 1056. In *Bierwirth*, the plan trustees purchased company stock at an elevated market price to defeat a takeover, but later sold the stock at a profit for the plan. The court found that an award of damages based on the difference between the market price and some court-calculated fair value was inappropriate, finding instead that the proper measure of damages "requires a comparison of what the Plan actually earned . . . with what the Plan would have earned had the funds been" used for proper, alternative investments after fixing a "reasonable time at which the performance of the improper investment will be measured." *Id.* at 1056-58.[12] *See also Leigh v. Engle*, 858 F.2d 361, 364 (7th Cir. 1988) ("*Leigh II*") (affirming order denying relief for two prohibited transactions that generated large profits for trust and awarding damages on one prohibited transaction that returned only four percent, which was less than "a prudent alternative investment.") Notably, in *Leigh II*

---

[12] The *Bierwirth* court also advised to choose the *most* profitable of the equally-plausible, alternative investments. *Id*. at 1056. Judge Posner has since questioned in *dicta* this additional direction, because it ignores the inherent uncertainty of investments. *Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008).

and *Bierwirth*, the fiduciary breach involved investments that were ultimately profitable for the plan.

A similar, related measure is the difference between the purchase price and the stock's current value. *Neil v. Zell*, 767 F. Supp. 2d 933, 948 (N.D. Ill. 2011). In *Reich v. Valley National Bank of Arizona*, for example, the defendants caused the plan sponsor to take on more debt for a leveraged ESOP buyout than its cash flow could support, causing the sponsor to go bankrupt three years later. 837 F. Supp. 1259, 1270-71, 1289 (S.D.N.Y. 1993). The court in *Valley National Bank* calculated the plan's loss based on the purchase price minus the minimal amount the plan received in the bankruptcy sale. *Id*. at 1288-89. In *Roth*, the Eight Circuit was presented with a defendant who repurchased stock from ESOP participants with promissory notes secured by company stock, which ultimately contributed to company's bankruptcy, leaving the participants with worthless notes and collateral. 61 F.3d at 600-01. The *Roth* Court held that the plaintiffs' loss was best measured by the difference between the purchase price and the worthless stock in bankruptcy, rather than the difference between the price and value at the time of the purchase, because "the decline in the value of the Company stock held by the Plan qualifies as a loss to the Plan under ERISA § 409(a)." *Id.* at 605.[13]

_____

[13] Although *Valley National Bank* and *Roth* relied on *Bierwirth*, neither inquired about possible returns on equally-plausible, alternative investments. The court in *Valley National Bank* did suggest that the plan's losses might include contributions spent to retire the purchase loan and release the then worthless stock, because contributions promised by an employer are part of the employees' compensation, and "if the ESOP's holdings in employer securities are worthless, the employees have lost certain of these

19

Finally, when a fiduciary breach involves paying too high a price for company stock, some courts have measured the plan's loss by "the difference between the amount originally paid for the stock and the fair market value of the stock." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 420 (6th Cir. 2002); *Horn v. McQueen*, 215 F. Supp. 2d 867, 873-74 (W.D. Ky. 2002). In *Chao v. Hall Holding Co.*, for example, the fiduciary caused the plan to enter a prohibited transaction under § 406(a) without adequate investigation into fair market value. 285 F.3d at 420, 444. The Sixth Circuit affirmed the district court order awarding the participants the difference between the purchase price and fair market value, which it distributed in cash to the participants based on the amount of stock that they had or would have received. *Id.* The Second and Eighth Circuits have explained that the amount of overpayment may be an appropriate measure of a plan's loss when the purchase price exceeded fair market value due to self-dealing, price manipulation or concealed information. *See Roth*, 61 F.3d at 603 (declining to measure loss by overpayment); *Bierwirth*, 754 F.2d at 1055 (same).

**A. Loss of Trachte share value**

Plaintiffs ask the court to adopt the *Roth* and *Valley National Bank* method, arguing that defendants' breaches resulted in an overpayment, caused Trachte to take on excessive debt and, in turn, caused Trachte's value to collapse. Under plaintiffs' theory they are entitled to recover the full purchase price through rescission of the 2007

---

deferred wages." 837 F. Supp. at 1287 (citing *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 642 (W.D. 1979)).

Transaction to the full extent possible because defendants caused the Trachte ESOP to lose the full value of its investment, including the full value of Trachte employees' former Alliance ESOP accounts used as leverage for the transaction.

Unfortunately for plaintiffs, they have not proven by a preponderance of the evidence that the acquisition debt or overpayment *caused* Trachte's collapse. In fact, the weight of the evidence strongly suggests otherwise. The excess debt no doubt placed additional pressure on Trachte, but plaintiffs' theory ignores the tsunami that was the 2008 financial crisis. Even with signs in late 2006 and 2007 that Trachte's value was inflated, Trachte managed to maintain its performance through most of 2007, ultimately collapsing only after the financial crisis, when its orders fell over 50% and its EBITDA fell to nearly $0 for reasons largely unrelated to servicing its sizable debt load. Having failed to prove by a preponderance of the evidence that defendants' fiduciary breaches caused Trachte's collapse, plaintiffs are not entitled to recover the full value of the Trachte common stock purchased by the Trachte ESOP. *See Mohler v. Unger*, 1994 WL 1860578, *18 (S.D. Ohio 1994) (refusing to award plaintiffs the difference in stock value because they had not established that the leveraged buyout caused the decline in the sponsor's stock). Complete rescission of the entire transaction is similarly inappropriate here, because it would award plaintiffs the entire purchase price of Trachte despite the 2008 recession being the principal cause of its precipitous loss in value.

Plaintiffs also argue that *any* recovery short of $22 million would provide no benefit to them, because of the size of Trachte's outstanding debt. Plaintiffs' argument is difficult to understand. Under the Department of Labor regulations, ESOP acquisition

21

loans are without recourse against the plan, with the exception of employee stock pledged as collateral that has not yet been released to employee accounts, 29 C.F.R. § 2550.408b-3(e), and the terms of the Trachte ESOP plan and the ESOP loan reflect this requirement.  (Trachte ESOP Plan, Joint Ex. 2 (dkt. #583), § 6.4; ESOP Loan and Pledge Agreement, Joint Ex. 33, (dkt. #587-4) § 2.3).  Even if the plan ultimately uses its recovery to release additional Trachte stock, plaintiffs' argument rests on a premise that mirrors defendants' mistaken argument that the debt was illusory.  Just as assuming additional debt was a loss to the Trachte ESOP, the retirement of that debt is a benefit to the plan.  Regardless, the court's only authorized role is to award damages available under ERISA and the plan documents, not to fashion sweeping, equitable relief out of whole cloth.

### B. Amount of overpayment for Trachte shares

Although plaintiffs have not proven that the 2007 Transaction caused Trachte's collapse, they have proven by a preponderance of the evidence that defendants caused the Trachte ESOP to overpay by $8,367,507.43.  The amount of overpayment may be an appropriate remedy when the purchase price exceeded fair market value because of a defendants' breach.  *Chao*, 285 F.3d at 420; *Bierwirth*, 754 F.2d at 1055.  Defendants argue that in this case, regardless of the overpayment, *any* award to plaintiffs would be inappropriate for two reasons:  (1) the 2008 financial crisis would have wiped out all the value of the plaintiffs' accounts in the Trachte ESOP even if it had paid fair market value, and (2) the Trachte ESOP is unlikely to ever repay the acquisition loans.

22

Defendants' first argument is that the 2008 financial crisis would have wiped out the value of any Trachte common stock held by the Trachte ESOP and, therefore, the value of the Trachte employees' accounts transferred from the Alliance ESOP.  Because the so-called "Great Rescission" wiped much of Trachte's equity, defendants argue, the fiduciary breaches did not ultimately cause plaintiffs to lose anything they would not have lost anyway, meaning any award of monetary damages would place plaintiffs in a *better* position than they would have been but for defendants' conduct.[14]  In short, "no harm, no foul."

Defendants' argument that the Trachte ESOP suffered *no* compensable loss rests at the other, equally-mistaken extreme as plaintiffs' claim to the full purchase price. Most important, it ignores plaintiffs' proof that Alliance, Fenkell and the Trachte Trustee Defendants caused the Trachte ESOP to pay more than fair market value for Trachte. The amount of this overpayment was both a real loss to plaintiffs (and a concomitant windfall to the Alliance Defendants) that can be estimated reasonably, resolving uncertainties about the extent of the overpayment against defendants, even if plaintiffs have not proven that the additional debt caused Trachte's business to collapse.  *See Roth*, 61 F.3d at 605 ("If a breach of fiduciary duty caused the Plan to purchase Company stock which declined in value, the causal link between the breach and the loss is established, even if the Company stock would have inevitably declined in value.").

---

[14] Defendants frequently maintain that any monetary award to plaintiffs would violate "ERISA's general policy" against "windfall" recoveries, but a windfall only occurs if a damage award exceeds that recoverable under ERISA or the plan documents.

Whether plaintiffs would later have lost the overpayment -- for whatever reason (e.g., because it was tied up as equity, reduced debt in Trachte or gambled away at the race track) -- is beside the point.[15]

In a similar vein, defendants argue that any recovery would be a windfall to plaintiffs, because it is unlikely that Trachte or the Trachte ESOP will repay the bank loans or seller's notes used to purchase Trachte.[16]   This argument is also unpersuasive. First, every court to consider it has rejected the argument that ESOP acquisition loans should be discounted below face value for purposes of calculating damages because the debt is unlikely to be repaid.  *See Neil v. Zell*, 767 F. Supp. 2d 933, 945 (N.D. Ill. 2011) (discussing cases).   The debt contracted as part of a leveraged ESOP transaction "represents actual consideration with concrete financial implications as well as forgone employee benefits." *Id.* at 945 n.10.

---

[15]  Indeed, having illegally off-loaded Trachte at an inflated price, one could argue just as easily by this reasoning that the Alliance Defendants obtained a "windfall" since it might otherwise be holding the now valueless Trachte stock.

[16]  The Trachte Trustee Defendants also argued that any reduction in the purchase price would have reduced the $5.67 million in subordinated promissory notes to Alliance and Pagelow, which would not affect the Trachte ESOP because those notes are an obligation of Trachte.   Defendants' argument that any reduction in the price would be allocated entirely to benefit the seller (by reducing the seller's note, rather than the cash paid by buyer or third-party debt) is an odd one for plan fiduciaries to make, as it suggests the plan's interests are secondary to the sellers.   Indeed, the court has already found that defendants violated ERISA by orchestrating such a seller-focused position throughout the 2007 Transaction.   Moreover, the distinction between Trachte debt and plan debt is largely illusory since the plan purchased a 100% interest in Trachte.   In any case, doubt or ambiguity as to how the overpayment *may* have been allocated is properly resolved against the party whose misconduct caused the uncertainty.  *Bierwirth*, 754 F.2d at 1056.

Second, defendants' argument ignores

> the obvious fact that the assumption of indebtedness has immediate legal and economic consequences even before the borrower begins to repay the debt. For example, the borrower's plans for the future are now constrained by the obligation to commit future income streams to repaying the loan, and the borrower's ability to obtain future loans at a low rate decreases, because the borrower is now a greater credit risk.

*Henry v. U.S. Trust Co. of Cal., N.A.*, 569 F.3d 96, 100 n.4 (2nd Cir. 2009) (rejecting argument that ESOP acquisition loan should be deducted from plan losses because company later forgave loan and repurchased stock as part of ESOP termination).

Third, the acquisition debt assumed by Trachte and the Trachte ESOP was *not* illusory. Indeed, the seller's notes are still accruing interest at 13%; the bank has not forgiven the loan to Trachte; and Trachte has not forgiven the loan to the Trachte ESOP. While the bank loans are in default, Trachte entered forbearance agreements and remains an ongoing enterprise. Finally, the Trachte ESOP has continued paying down its loan to Trachte with the employees' retirement contributions at the inflated price set in the 2007 Transaction.

Therefore, the court concludes that defendants' fiduciary breaches caused the Trachte ESOP to lose $8,367,507.43 by paying more than fair market value. Because the former Trachte employee participants in the Alliance ESOP will be reinstated to the full value of their former Alliance ESOP accounts as described below, the Trachte ESOP's recovery must be adjusted by the percentage of ownership accorded to those accounts in the Trachte ESOP. The Trachte ESOP received 100% of Trachte's equity, of which the

share exchange represented 22.631%.   Accordingly, plaintiffs recovery for the participants of the Trachte ESOP will be reduced to $6,473,856.82 as an approximation of the difference between the purchase price for the equity interest that the plan purchased with debt and Trachte's fair market value as of August 29, 2007.

For their breach of fiduciary duty to the Trachte ESOP, the court will order Mastrangelo, Seefeldt and Klute to restore to the Trachte ESOP $6,473,856.82. However, as discussed below the Trachte ESOP trustees are entitled to indemnification from Alliance and Fenkell.[17]  Because the price at which the Trachte ESOP has been redeeming Trachte shares was set by the 2007 Transaction, all participants of the Trachte ESOP have suffered from the overpayment.  Therefore, the Trachte ESOP shall allocate this amount to the class members' accounts according to their current shares as of the date of this judgment.

---

[17] This adjustment arguably fails to account for yet another, small wrinkle.  The Trachte ESOP purchased 2515.1895 shares of Trachte common stock held by Pagelow and Alliance in step 11 of the transaction, paying $13,727.50 per share, for a total of $34,481,056.98. That share price was calculated based on 3213 shares at SRR's valuation of $44,100,000, which did not deduct for the phantom stock liability.  (SRR kept that liability on the books of Alliance.)  Thus, comparing the share price paid by the Trachte ESOP to the share price at fair market value would result in a higher recovery for the Trachte ESOP.  However, in step 9 the transaction, Trachte redeemed $2 million of preferred shares and 573.7976 common shares from Alliance with a promissory note for only $4,370,000 or $4,130.38 per common share.  Fortunately, the court need not unravel the various share prices to allocate the overpayment between Trachte and the Trachte ESOP, because the Plan ultimately became the sole owner of 100% of Trachte's equity.  Accordingly, it is appropriate to compare the total purchase price for Trachte's common equity to the fair market value for that common equity.

**C. Trachte employees' loss of Alliance ESOP interest**

On behalf of the subclass, who were participants or beneficiaries in the Alliance ESOP at the time of the 2007 Transaction, plaintiffs seek restoration of their accounts in the Alliance ESOP.  The Alliance Defendants contend that (1) reinstatement is not an available remedy and (2) restoration of the account balance is inappropriate because plaintiffs would have lost the entire value of their Alliance ESOP accounts regardless of the 2007 Transaction.

The Alliance Defendants first argue that reinstatement of the Trachte employees in the Alliance ESOP is not available as equitable relief because the court ruled on summary judgment that the spin-off complied with ERISA § 208.  However, the court ruled after trial that Fenkell and Alliance breached their fiduciary obligations of prudence and loyalty to the Alliance ESOP under § 404(a), that Fenkell caused the Alliance ESOP to enter a prohibited transaction under § 406 and that Alliance is liable for Fenkell's violation of § 404 and § 406.

Reinstatement is an available remedy for fiduciary breaches under ERISA § 502(a)(2)(3).  *Varity Corp. v. Howe,* 516 U.S. 489, 515 (1996).  In *Varity*, the Supreme Court held that former participants deceived into withdrawing from a plan by its administrator could pursue individual relief for reinstatement and breach of fiduciary duties.  *Id.*  Defendants' cite *Paulsen v. CNF Inc.*, 559 F.3d 1061 (9th Cir. 2009), in support of their position that plaintiffs cannot seek reinstatement, but *Paulsen* recognized reinstatement as an available form of equitable relief when a fiduciary breach causes a plaintiff to withdraw from the plan; it held only that the plaintiffs in that case could not

seek reinstatement because the defendant was not acting as a plan fiduciary.  *Id.* at 1076.  Here, plaintiffs seek reinstatement in the Alliance ESOP in order to compensate the Alliance ESOP for the loss that Fenkell and Alliance's fiduciary breaches caused to plaintiffs' defined contribution accounts.[18]

The Alliance Defendants next argue that plaintiffs should not be restored to the value of their account because the 2008 financial crisis would have wiped out the value of plaintiff's accounts in the Alliance ESOP regardless of the 2007 Transaction. Defendant's argument is unpersuasive for the reasons stated above.  It also suffers from an additional false factual premise: it assumes that the participants' holdings would have been converted to Trachte stock even if the 2007 Transaction had not occurred as planned.  As the court found above, the more likely alternative to an ESOP buyout at fair market value was a third party sale, in which case the Trachte employees would have remained in the Alliance ESOP and been paid by its terms.

While plaintiffs have not proven that the overpayment caused Trachte's collapse, they have proven that Alliance and Fenkell offered up the Trachte employees' accounts in the Alliance ESOP as collateral to obtain an overpayment for their Trachte shares and that breach was a necessary condition for the subsequent events.  If Alliance and Fenkell had not entered this prohibited transaction and breached their fiduciary duties of loyalty

--------

[18] Alternatively, plaintiffs may sue as former participants under ERISA § 502(a)(2), which cross-references § 409 and authorizes other appropriate equitable relief. "[A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account" within a defined contribution plan. *LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 256 (2008).

and prudence, the Trachte employees would most likely have remained participants in the Alliance ESOP and received the full value of their Alliance accounts.  By offering the accounts as collateral in a highly-leveraged purchase, Alliance and Fenkell subjected the accounts to a substantial risk that was ultimately realized when Trachte's value collapsed.  But for defendants fiduciary breach, this subclass of plaintiffs would not have lost the entire value of their accounts in the Alliance ESOP.

For all these reasons, the court finds that members of the subclass are entitled to have the value of their accounts restored and will order Alliance and Fenkell to reinstate the members of the subclass to the Alliance ESOP and to restore the $7,803,543 value of the holdings in their accounts as of August 29 2007, adjusted for prejudgment interest as described below.  This amount shall be allocated to their accounts in the Alliance ESOP in proportion to their stock ownership as of August 29, 2007.

### D. Restoring Fenkell's and Alliance's Windfall Profits

ERISA § 409 states that a trustee shall disgorge any profits "made through the use of plan assets," which the Seventh Circuit has held "permits recovery of a fiduciary's profits only where there is a causal connection between the use of the plan assets and the profits made by fiduciaries on the investment of their own assets." *Leigh I*, 727 F.2d at 138.  "If no misuse of the funds occurs, if no losses are incurred or profits obtained that differ from what they would have been had there been no breach of fiduciary duty, there is no remedy."  *Wsol v. Fiduciary Mgmt. Assoc., Inc.*, 266 F.3d 654, 658 (7th Cir. 2001).  Once a causal connection is shown, however, "the burden is on the defendants who are

found to have breached their fiduciary duties to show which profits are attributable to their own investments apart from their control of the [plan] assets." *Leigh I*, 727 F.2d at 138.

In its liability ruling, the court concluded that Fenkell breached his fiduciary duty of loyalty and prudence by using the Alliance ESOP accounts of the Trachte employees to obtain a higher price and to ensure that he received a payment on the phantom stock plan. Accordingly, the court has found already the requisite causal connection between Fenkell's violation and the phantom stock payment.

Moreover, of the defendants found liable, Fenkell is far and away the most culpable party. Each time he testified, the court was increasingly impressed by Fenkell's complete recall of minor details and sophisticated understanding of ERISA transactions, as well as the law governing those transactions. After Pagelow was sidelined by the 2002 sale, Fenkell was easily the smartest person in the room. He held between a $2.5 and $3 million interest in the phantom stock plan for Alliance employees. He knew that under any alternatives to a leveraged ESOP purchase, he was unlikely to receive any immediate phantom stock payments and his interest in the phantom stock plan would follow Trachte to what he expected to be an unhappy ending. Fenkell testified largely unconvincingly that HIG's refusal to pay the phantom stock plan did not affect his decision to walk away from its offer -- even though he unquestionably recognized this was his obligation in his fiduciary roles. While his testimony was not credible, it does reveal that Fenkell knew his interest in the phantom stock plan potentially conflicted with his obligation to act in the interests of Alliance and the Alliance ESOP.

30

Despite fully understanding this substantial conflict of interest, Fenkell nevertheless orchestrated the 2007 Transaction to ensure that (1) he would receive his full phantom stock payment; (2) no truly independent person would look out for the other participants' interests; and (3) the transaction's structure would provide him with a plausible legal shield.  Moreover, Fenkell used Alliance's position as employer of the Trachte ESOP Trustees to ensure the transaction would be arranged to pay out Alliance's phantom stock plans and used his control over the Alliance ESOP plan assets to ensure Alliance would receive a higher price by offering up the holdings of Trachte employees in the Alliance ESOP as collateral.[19]

Nevertheless, Fenkell argues he should be required to restore only that *portion* of his phantom stock payment that corresponds to the Trachte ESOP's overpayment.[20] Even if this court were so inclined, Fenkell offered the court no method to recalculate that portion of the phantom stock proceeds, as was his burden.  *Leigh I*, 727 F.2d at 138. Regardless, the court is not so inclined because, had Fenkell not orchestrated the 2007 Transaction, he most likely would have received *no* payment under the phantom stock

---

[19] Despite all of these conflicts, Fenkell might still have avoided fiduciary liability by ensuring that a truely independent and unrestricted agent had reviewed the deal for fairness to the Trachte employee participants in the Alliance ESOP, but he knew that independent review might have delayed the transaction, reduced the transaction price and/or interfered with his phantom stock payment.

[20] Fenkell also argues that the court cannot order disgorgement because the phantom stock payments were not plan assets and were paid by Trachte, who is not a party.  On the contrary, Fenkell can be required to disgorge his phantom stock profits regardless of the source of those funds because he received them by breaching his fiduciary duty to the Alliance ESOP. *Leigh I,* 727 F.2d at 122 n.17.

plan and would now be in the same position as the participants in the phantom stock plan for Trachte employees: holding onto rights that, in all likelihood, will never be paid. To prevent Fenkell from benefitting from his own fiduciary breach, therefore, the court will order that Fenkell restore the full $2,896,000 he received in phantom stock proceeds to Trachte, on the condition that Trachte reinstate Fenkell's phantom stock. Assuming Trachte accepts this arrangement, it will place Fenkell and the Trachte ESOP plan in the same position they would have been but for Fenkell's breach.[21]

Plaintiffs also argue that Alliance should be required to disgorge any profit it made in connection with the use of plan assets in the 2007 Transaction, which they argue is the $12.35 million difference between the price that Alliance paid in 2002 and the consideration it received in 2007. This argument overreaches on a number of levels. As an initial matter, it fails to account for the additional shares that Alliance purchased from Pagelow in 2005, so that Alliance sold a 4.25% larger interest in 2007 than it purchased in 2002. In addition, plaintiffs include the $4.3 million seller's note as part of Alliance's so-called profits, although that note is worthless. Plaintiffs also made no effort to differentiate between the increase in share value attributable to Trachte's performance between 2002 and 2007 and Alliance's "profit" from its fiduciary breach. Finally, apart from the inflated calculation of profit, the court finds that plaintiffs have not proven by a preponderance of the evidence that Alliance received any "profit" through the use of plan

---

[21] Because Trachte is not a party to this case, the court has no power to order Trachte to take any particular action.

assets in the 2007 Transaction beyond benefiting from an underpayment in the purchase price already awarded as damages.

### E.  Prejudgment interest

District courts have discretion to award prejudgment interest in ERISA cases to fully compensate victims and prevent unjust enrichment. *Trustmark Life Ins. Co. v. University of Chicago Hospitals*, 207 F.3d 876, 885 (7th Cir. 2000) (citation omitted). "Whether to award prejudgment interest to an ERISA plaintiff is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities," including consideration of the parties' bad faith.  *Id.* (quotation omitted).  Because Fenkell and Alliance have unjustly benefited for six years from the use of the overpayment and the share-exchange which they procured by ignoring their fiduciary responsibilities, the court finds that Fenkell and Alliance should be liable for prejudgment interest.  The Trachte Trustee Defendants, in contrast, were acting in good faith (albeit naively), received no profits from the sale or the breaches of their fiduciary duties and, therefore, were not unjustly enriched.

The Seventh Circuit's default rule is to award prejudgment at the prime rate on the date of judgment, unless the court "engages in 'refined rate-setting' to determine a more accurate market rate for interest." *First Nat. Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999).  *See also Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 437 (7th Cir. 1989) (district courts have discretion to award compounding interest).  Plaintiffs ask the court to assume a 4.633% interest rate,

which would represent the return on a risk-free U.S. Treasury securities purchased on August 29, 2007.  The court declines to use plaintiffs' proposed method because they have cited no authority for it, and it ignores the risk of investment and the post-transaction events. The court finds that plaintiffs are entitled to quarterly compounding interest at the current prime rate.

### III. Removal of ESOP Trustees

Removal of trustees is appropriate if they engaged in "repeated or substantial" violations of their fiduciary duties.  *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984).  Although Fenkell's violations were not repeated, they were substantial.   Fenkell manipulated plan assets to benefit Alliance and himself with conscious disregard for the interests of the Trachte employee participants in the Alliance ESOP.  In opposition to the request for Fenkell's removal, the Alliance Defendants repeat their argument that the phantom stock payments were merely deferred executive compensation, an argument the court has already addressed and rejected.

The Alliance Defendants also allege that plaintiffs lack standing to seek Fenkell's removal as trustee of the Alliance ESOP.  (Alliance Def.'s Answer (dkt. #261) ¶ 304.)  Specifically, in their trial brief on remedies, they argue that plaintiffs lack standing to seek Fenkell's removal as a form of prospective relief, because plaintiffs are former participants without prospect of reinstatement to the plan.  The court's finding above that plaintiffs are entitled to reinstatement and compensation for their lost account balances moots this argument.  The court will, therefore, order Fenkell's removal as

trustee of the Alliance ESOP.  Seefeldt, Mastrangelo and Klute are no longer trustees of the Trachte ESOP (Anderson Aff., dkt. #758), so plaintiff's request for their removal is also moot.

Plaintiffs also seek a permanent injunction barring defendants from serving as fiduciaries for any ERISA plan that covers the class members or any employee of Trachte. (Cpt. (dkt. #254), 86.)   Appropriate equitable relief under ERISA may include "a permanent injunction barring a former ERISA fiduciary from providing services or acting as a fiduciary to any employee benefit plan in the future." *Chao v. Merino*, 452 F.3d 174, 185 (2d Cir. 2006).  Such an injunction is not warranted against the Trachte Trustee Defendants.  Although they were in over their heads and acting with a conflict of interest, they acted in apparent good faith and their failures were not the kind of flagrant and egregious conduct that warrants a permanent injunction.  *See id.* (defendant repeatedly failed to  failed to prevent embezzlement of plan assets by service provider she knew could not be trusted).  With respect to Fenkell, plaintiff's specific, requested injunction is moot given that Fenkell has no ongoing relationship with Trachte and will now be barred from acting as a trustee to the Alliance ESOP.

## IV.  Indemnification

The Trachte Trustee defendants filed a cross claim for equitable relief against the Alliance Defendants.[22]   The Seventh Circuit has held that ERISA Sections 409 and

---

[22] The Trachte Trustee Defendants cross claim requested equitable relief in the form of disgorgement from the Alliance Defendants, but the trustees, like the plaintiffs, made no

502(a)(2) incorporate a federal common law right to indemnification or contribution, which permits a relatively less culpable fiduciary to seek complete (indemnity) or partial (contribution) reimbursement for compensatory damages from a more culpable fiduciary. *Free v. Briody*, 732 F.2d 1331, 1336-38 (7th Cir. 1984).  In *Free,* the court found that "a nominal trustee" who breached his duty by failing to exercise any oversight or control over plan assets could seek indemnification from a more culpable trustee who actively defrauded the plan.  *Id.* at 1338.  *See also Alton Mem'l Hosp. v. Metro. Life Ins. Co.,* 656 F.2d 245, 250 (7th Cir. 1981) ("fiduciary may seek indemnification or contribution from co-fiduciaries in accordance with 29 U.S.C. § 1105(a)"); *Daniels v. Bursey*, 329 F. Supp. 2d 975 (N.D. Ill. 2004) (finding contribution right for fiduciary against non-fiduciaries).

The Trachte Trustee Defendants violated their duty of prudence by failing to follow the plan terms and allowing the Trachte ESOP to enter a prohibited transaction without adequate investigation of fair market value.  On the other hand, the Alliance Defendants, and particularly Fenkell, used their positions of authority over the Trachte Trustees and their control of the Alliance ESOP plan assets to orchestrate a transaction at an inflated price.  In fact, when it came to orchestration of the 2007 Transaction, Fenkell was the unquestioned conductor and the Trachte Trustees mere musicians.

Furthermore, the only benefit the Trachte Trustee Defendants derived from the 2007 Transaction was to keep their jobs, having lost the value of their retirement accounts along with the other Trachte employees.  In contrast, Alliance received the full

---

effort to prove what proportion of the sale price should be considered Alliance's "profits."

benefit of an overpayment it orchestrated through the fiduciary breaches of Alliance and Fenkell. If the 2007 Transaction had not occurred, either Trachte would have sold at a lower price or Alliance would have been stuck with Trachte when its revenue fell over 50% and its value plummeted. In these circumstances, the court finds that defendants Mastrangelo, Seefeldt and Klute are entitled to indemnification from defendants Alliance and Fenkell.[23]


## ORDER

IT IS ORDERED that:

1. Defendants Mastrangelo, Klute and Seefeldt's motion to supplement the record (dkt. #756) is GRANTED.

2. Defendants Alliance, Fenkell and the Alliance ESOP shall reinstate the individual plaintiffs as participants in the Alliance ESOP in 30 days.

3. Defendants Alliance, Fenkell, A.H.I. and AH Transition are jointly and severally liable to restore to the Alliance ESOP $7,803,543 plus prejudgment interest, which shall be allocated according to the accounts of the members of the subclass in proportion to their holdings in the Alliance ESOP as of August 29, 2007, with the exclusion of defendants Mastrangelo, Seefeldt and Klute.

4. Defendant Fenkell shall restore to Trachte Building Systems, Inc. the $2,896,000 he received in phantom stock proceeds as part of the August 29, 2007 Transaction, if Trachte will agree to restore Fenkell's phantom stock plan.

5. Defendants Mastrangelo, Seefeldt and Klute shall pay to the Trachte ESOP

---

[23] In its liability ruling, the court concluded that plaintiffs had not proven the Alliance Defendants should be held liable for the Trachte Trustee Defendants' failure to follow the plan terms or perform adequate investigation. Here, in contrast, the court is not holding the Alliance Defendants liable for the trustees' failures but apportioning liability equitably according to the parties' respective culpability for the overpayment.

$6,473,856.82 plus prejudgment interest, which shall be allocated to the class members' accounts according to their current shares as of the date of this judgment, with the exclusion of defendants Mastrangelo, Seefeldt and Klute.

6. Defendants Alliance and Fenkell shall indemnify defendants Mastrangelo, Seefeldt and Klute for any compensatory relief they are required to pay.

7. Defendant Fenkell shall be barred from continuing as trustee of the Alliance ESOP.

Dated this 4th day of June, 2013.

BY THE COURT:

/s/

_____

William M. Conley
District Judge

APPENDIX

**Phantom Stock Calculations For BWVS Valuation (based on triggering event)**

| | | | |
|---|---|---|---|
| "Total consideration" to Alliance, i.e. (TIC - preferred equity)*Alliances ownership % + SNS[24] | $37,193,424 | $45,574,121 | $41,383,772 |
| divided by "denominator" (set by phantom stock plan terms) | 67,693 | 67,693 | 67,693 |
| = "total maturity value" | 549 | 673 | 611 |
| X total Alliance employee phantom stock units | 6,769 | 6,769 | 6,769 |
| = value of Trachte Phantom Stock Plan for Alliance Employees | $3,719,177.52 | $4,557,210.08 | $4,138,193.80 |
| X total Trachte employee phantom stock units | 2,011 | 2,011 | 2,011 |
| = value of Trachte Phantom Stock Plan for Trachte Employees | $1,104,929.24 | $1,353,900.06 | $1,229,414.65 |

**Phantom Stock Calculations For HIG Adjustment (based on triggering event)**

| | | |
|---|---|---|
| "Total consideration" to Alliance, i.e. (TIC - preferred equity)*Alliances ownership % +SNS | $41,182,029.57 | $46,682,029.57 |
| divided by "denominator" (set by phantom stock plan terms) | 67,693 | 67,693 |
| = "total maturity value" | 608 | 690 |
| X total Alliance employee phantom stock units | 6,769 | 6,769 |
| = value of Trachte Phantom Stock Plan for Alliance Employees | $4,118,020.45 | $4,667,996.07 |
| X total Trachte employee phantom stock units | 2,011 | 2,011 |
| = value of Trachte Phantom Stock Plan for Trachte Employees | $1,223,421.35 | $1,386,813.43 |

---

[24] The Phantom Stock Plan uses the "aggregate dollar amount of consideration received by the Corporation's shareholders in connection with such Change of Control," but offers no more specific definition. I have taken the phantom stock units as of December 31, 2006 (SRR Annual Valuation, (Dkt. #593-4) Appx. D, Ex. H.)